# THE BLUE JACKET.

## THE TACOMA.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF
WASHINGTON.

No. 241. Argued March 24, 25, 1892. — Decided April 4, 1892.

A collision occurred between a ship and a steam-tug while the navigation rules established by the act of March 3, 1885, c. 354, 23 Stat. 438, were in force. The tug was required to keep out of the way of the ship and the ship to keep her course. The tug ported her helm to avoid the ship, and that would have been effectual if the ship had not afterwards changed her course by starboarding her helm. If the ship had kept her course, or ported her helm, the collision would have been avoided. The change of course by the ship was not necessary or excusable. The tug did everything to avoid the collision and lessen the damage. The tug had a competent mate, who faithfully performed his duties although he had no license. Although the tug had no such lookout as was required by law, that fact did not contribute to the collision. The tug did not slacken her speed before the collision. There was no risk of collision until the ship starboarded, and then the peril was so great and the vessels were such a short distance apart that the tug may well be considered as having been *in extremis*, before the time when it became her duty to stop and reverse, so that any error of judgment in not sooner stopping and reversing was not a fault.

The case of *The Manitoba*, 122 U. S. 97, distinguished.

The tug was not in fault and the ship was wholly in fault.

The appeal being from the Supreme Court of the Territory of Washington, and that Territory having become a State, the case was remanded to the Circuit Court of the United States for the District of Washington, (Act of February 22, 1889, c. 180, 25 Stat. 676, 682, 683, §§ 22, 23,) for further proceedings according to law.

THE case is stated in the opinion.

*Mr. John B. Allen* for appellant.

*Mr. John H. Mitchell* for appellee.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On the 11th of June, 1885, about two o'clock in the morning, the steam-tug Tacoma was towing the bark Colusa, of about 1200 tons burden, laden with lumber and bound on a voyage to San Francisco, California, from Port Townsend, in the Territory of Washington, to Cape Flattery, the bark being towed by a hawser about 150 fathoms long, and the stern of the tug being about 750 feet ahead of the stem of the bark. When the tug and the bark were about four miles to the north of Ediz Hook light, in the Straits of Fuca, in the Territory of Washington, they were steering west-southwest half west, anu moving along a path west half south, at the rate of about two miles an hour by the land. The ship Blue Jacket, of San Francisco, was on her way from that city to Seattle, in the Territory of Washington, and when she was about two miles from the tug, and showed her red light about three-tenths of a point on the port bow of the tug, she was sighted by the lookout on the tug. The weather was cloudy but the air was clear, with a fresh breeze blowing from the west-southwest; and the tide was flood, running up the Straits of Fuca at the rate of three miles an hour, from west-southwest or west-southwest half west. The ship's mean course was east-northeast, but her course was really along a swinging path, deviating alternately to starboard and port about one-half of a point each way from her mean course,

and crossing the same about every one-half mile, at intervals of about every four minutes. She was running with a fair wind and tide, and going ahead at the rate of about eight miles an hour by the land.

The lookout on the ship first sighted the tug about half an hour before the collision hereinafter mentioned, about half a point on the starboard bow of the ship and five miles away, showing two white mast-head lights to the ship at that time and at all times up to the collision, and the red lights of the tug and the bark being seen by those on board of the ship from 10 to 12 minutes before the collision. When the tug was so sighted, she was reported at once to the master and mate of the ship. Two and one-half minutes before the collision, the tug being about one-third of a mile from the ship and half-a-point off her port bow, the ship bearing about one and three-eighths points off the port bow of the tug, and showing both her lights to the bark and her red light to the tug, and the bark bearing dead ahead from the ship, the tug, for the purpose of avoiding the ship, put her helm hard-a-port and swung to starboard; but the ship immediately thereafter, instead of keeping her course or putting her helm to port, put her helm hard-a-starboard and kept it in that position until the collision occurred. Neither the tug nor the bark, at any time up to the collision, showed to the ship any side or colored lights except their red lights. By putting her helm hard-a-starboard, the ship slewed rapidly around to her port until her course was changed to about north-northeast; and while the tug was still swinging to her starboard under a port helm, the two vessels came into collision, the ship striking the tug bow on, on the port side of the tug just abaft of midships, and damaging the tug seriously.

On the 3d of September, 1885, the Tacoma Mill Company, owner of the tug, filed a libel *in rem* against the ship, in the District Court of the Third Judicial District of Washington Territory, claiming to recover from the ship $12,000 as damages. Process was issued, and the ship was duly seized and due notice given. On the 4th of September, 1885, the master of the ship put in a claim to her, for D. O. Mills as her owner.

On the 29th of October, 1885, D. O. Mills, as such owner, filed a cross-libel *in rem*, in the same court, against the tug, to recover $900 damages. On the 29th of October, 1885, the master of the ship, on behalf of her owner, put in an answer to the libel of the Tacoma Mill Company.

On the 2d of April, 1886, the Tacoma Mill Company filed an amended libel against the ship, and on the same day the same company filed an answer to the cross-libel of D. O. Mills. The amended libel sets forth the particulars of the occurrences which preceded and attended the collision, and alleges that there was no negligence on the part of the tug, but that shortly after her helm was put hard-a-port, the ship, instead of keeping her course, as it was her duty to do, and which would have avoided the collision, negligently put her helm hard-a-starboard; that by that time the tug and the ship were so close together, and the course of the ship, then running free, was thereby so changed, that the tug could not keep out of her way; that the ship had not a proper lookout or watch; that no special circumstances existed which rendered necessary a departure from the steering and sailing rules prescribed by act of Congress; that the ship did not have her side-lights properly set, but they were so placed that they did not throw a uniform or unbroken light from right ahead to two points abaft the beam, or at all, and she did not, on the approach of the tug, show a lighted torch, as she should have done, on the point or quarter of the ship which the tug was approaching; and that, if those in charge of her, when they put her helm hard-a-starboard, had hauled her spanker boom midships and braced her after yards in on the port side, all of which they negligently failed to do, although they had abundant time so to do, the collision would have been avoided. The answer to the cross-libel makes the same allegations.

The cross-libel against the tug alleges that the latter, when about 1000 or 1500 feet away from the ship, and about two points off her starboard bow, hard-a-ported her helm and unskilfully threw herself across the bows of the ship, and rendered a collision imminent; that the tug had no colored lights set, and it was not discovered by those in charge of the navi-

gation of the ship that the tug had changed her course until she was within about 275 or 300 feet of the ship, and steering directly across her bows; that it was then apparent to those in charge of the navigation of the ship that if she kept her course or ported her helm she would collide with either the tug or the bark and perhaps both, and they, thinking and believing that those in charge of the navigation of the tug would stop and reverse her engine, which they should have done and which would have avoided the collision, the helm of the ship was immediately put hard-a-starboard, for the purpose of rendering the blow and the damages as light as possible, in case the vessels collided, and because it was believed that by so doing the ship would clear the tug; that that was all it was possible for the ship to do toward avoiding the collision, which occurred within two or three minutes after it appeared to the ship that the tug had changed her course; that the tug should have kept her course and passed to the starboard of the ship, which would have avoided the collision; that the tug should have exercised precautionary measures to prevent the collision from the time she sighted the ship, which she did not do; that the tug placed the ship in such a position that it was impossible for the ship to do anything that would avoid a collision; that the tug, when she saw that the collision was probable, should have stopped and reversed her engine, which she did not do, and which would have avoided the collision; that the tug should have had her green and red lights set, which she did not have, and which would have enabled the ship to observe her change of course; that the tug should have indicated her course by signals on her steam whistle, which she did not do; that at the time of the collision and for some time prior thereto, the person acting in the capacity of first officer of the tug had charge of her navigation and was acting also as wheelsman and lookout, and had no officer's license, and was so acting in violation of law, and was wholly incompetent and not a suitable person to occupy such a position; and that the tug did not have, before or at the time of the collision, a wheelsman or proper lookout to guard against the danger of a collision.

It also alleges that the collision was due to the negligence of the tug, and that there was no fault on the part of the ship. The answer to the libel contains substantially the same allegations as the cross-libel.

The record properly omits the proofs; but shows that on the 7th of March, 1887, the cause having been heard on the pleadings and proofs, the District Court filed its findings of fact and conclusions of law. The findings of fact were 29 in number, and were verbatim the same as the first 29 findings hereinafter set forth, made by the Supreme Court of the Territory on appeal. The first, second, and fourth conclusions of law made by the District Court were in terms identical with the first, second and fourth conclusions of law of the Supreme Court of the Territory, hereinafter set forth. The third conclusion of law made by the District Court was that the Tacoma Mill Company was entitled to recover from the claimants of the ship $11,043.75 and costs, and was entitled to a decree that the stipulators for the claimant of the ship pay that sum into court within ten days, with the costs; and that, in case they failed so to do, the company was entitled to a summary judgment against them, and each of them, for said amount and costs, and for an order for execution.

Prior to the filing of the findings of fact and conclusions of law by the District Court, proposed findings appear to have been presented to that court by the Tacoma Mill Company on behalf of the tug, and brought to the attention of the counsel for the ship, because on the 28th of February, 1887, a petition for a rehearing was filed in the District Court on behalf of the ship, and on the 4th of March, 1887, exceptions were filed by the ship to the whole or parts of findings of fact Nos. 3, 5, 6, 9, 10, 11, 12, 14, 16, 17, 20, 21, 22, 23, 24, 25. 26 and 27, and to all of the conclusions of law.

On the 8th of March, 1887, a decree was entered by the District Court, with the title of the libel and the cross-libel, dismissing the cross-libel at the cost of the cross-libellant, and decreeing that the Tacoma Mill Company recover from the claimant of the ship $11,043.75 and costs, and that the stipulators for the claimant of the ship pay that sum and the costs

into court within twenty days, and that in case they failed to do so a summary judgment should be entered against them, and each of them, on their stipulation, for the amount thereof, and execution should issue therefor to satisfy the decree. On the same day, the claimant of the ship and cross-libellant appealed in open court from the decree to the Supreme Court of the Territory.

The case was heard in the Supreme Court of the Territory, and on the 25th of July, 1888, it announced that the decision of the District Court was affirmed in full. A petition for a rehearing was then filed on behalf of the ship and was heard and denied. The opinion of the Supreme Court in the case is reported in 3 Washington Ter. 581, and was delivered by Justice Langford, and concurred in by his two associates. It says: "In this case the appeal is from both the findings of fact and the conclusions of law thereon. There is no contention but that the conclusions of law of the District Court were correct if the findings of fact were correct; but the sole contention is, that the District Court erred as to its findings of fact, and hence that conclusions of law predicated on such erroneous findings of fact were wrong, but only because the findings of fact were wrong. As this court refinds the facts as the District Court found them, (with the additional findings requested by the proctor for the appellants hereunto attached and adopted by this court,) all contention ceases except as to the error of fact. The only opinion, therefore, that could be written in this case, that would be germane to the question raised, would be an opinion which would give reasons as to why the findings of fact are correct deductions from the evidence. Such could not be useful or necessary, and hence no attempt will be made to give reasons for the findings of fact. But these findings of fact and conclusions of law thereon are all the decision which the case requires, and they are as follows." Then follow the findings of fact, 30 in number, and the 3 additional findings of fact requested on the part of the ship and found by the Supreme Court, and also its conclusions of law, all of which are set forth in the margin, the part in brackets at the close of the first additional finding of fact not

being contained in that additional finding as requested by the proctor for the ship, but being added by the court.[1]

---

[1] 1. That the libellant, the Tacoma Mill Company, is and at all times mentioned in the pleadings in this cause was a corporation organized and existing under the laws of the State of California and duly authorized to do business in the Territory of Washington.

2. That said libellant, before and at the time of the collision mentioned in these findings, was and still is the owner and proprietor of the steam-tug Tacoma, with her steam-engines, boilers, machinery, tackle, apparel and furniture; which said steam-tug said libellant used in towing vessels from, to and between the various ports of Puget Sound and the Pacific Ocean, on the waters of Puget Sound and the Straits of Fuca and through the waters tributary and adjacent thereto, and where she was regularly run, daily and every day except Sunday, for the purposes aforesaid.

3. That on the eleventh day of June, 1885, at the hour of about two o'clock in the morning of said day, said steam-tug Tacoma, with her steam-engines, boilers, apparel, tackle and furniture on board, was towing the bark Colusa, of the port of Boston, of about twelve hundred tons burden, then and there lumber-laden and bound upon a voyage to San Francisco, California, from the port of Port Townsend, in said Territory of Washington, to Cape Flattery, and the said steam-tug, with said tow, was then about four miles to the north of Ediz Hook light, in the Straits of Fuca, steering west-southwest one-half west and moving along a path west one-half south at the rate of about two miles per hour by the land.

4. That at that time and up to the time when said ship put her helm hard-a-starboard, as hereinafter mentioned, said bark was being towed by said tug by means of a hawser about one hundred and fifty fathoms in length, and from the stern of the said tug to the stem of said bark the distance was about seven hundred and fifty feet, and during all the times mentioned herein said bark was steering the same course as said tug.

5. That at that time, and during all times up to the collision hereinafter mentioned, the weather was cloudy, the air was clear, and a fresh breeze was blowing from the west-southwest, and the tide was flooding, running up the Straits of Fuca at the rate of three miles per hour from west-southwest or west-southwest one-half west.

6. That said steam-tug at that time and up to the time of the collision hereinafter mentioned was tight, staunch, strong and in every respect well tackled, apparelled an appointed and had the usual complement of officers and men, and was also, except as hereinafter found, well manned.

7. That said tug at that time and at all times herein mentioned carried all the lights prescribed by law and carried the same in the manner prescribed by law, and the same were at all of said times properly set and brightly burning.

8. That said bark Colusa at all times carried all the lights prescribed by the law and carried the same in the manner prescribed by law, and the same were at all times properly set and brightly burning.

Opinion of the Court.

On the 14th of August, 1888, the Supreme Court entered a decree dismissing the cross-libel at the cost of the cross-

9. That at about ten minutes before two o'clock in the morning of said day, while said steam-tug was towing said bark Colusa at the place and in the manner hereinbefore stated and steering on the said course, the ship Blue Jacket, of San Francisco, whereof F. F. Percival was then and there master, and being then on her way from San Francisco to the port of Seattle, in the Territory of Washington, was first sighted by the lookout of said tug, said ship then being about two miles distant from said steam-tug, and showing her red light about three-tenths of a point on the port bow of said steam-tug.

10. That the mean course of said ship at all the times mentioned in these findings up to the time her helm was put hard-a-starboard was east-northeast, but her course was really along a swinging path deviating alternately to starboard and port about one-half a point each way from said mean course, and crossing the same about every half mile, at intervals of about every four minutes up to the time her helm was put hard-a-starboard, as hereinafter stated, which was done when said ship was on the port side of said mean course.

11. That said ship was running with a fair wind and tide and at all times up to the time of the collision was going ahead at the rate of about eight miles per hour by the land.

12. That said steam-tug was first sighted by the lookout of said ship about half an hour before said collision and was then about one-half a point off the starboard bow of said ship and five miles away from her, showing two white mast-head lights to said ship at that time and at all times up to the time of said collision, the said tug steering at that time and at all times until her helm was put hard-a-port, as hereinafter stated, a course of west-southwest one-half west, but owing to the deflecting influence of wind and tide moving along a path in the direction of west one-half south; that said tug when so sighted by said lookout was at once reported to the master and mate of said ship.

13. That, owing to the improper manner in which said ship was steered and to the irregular course which she pursued in consequence of such improper management, said tug bore from said ship from time to time about as follows:

At twenty-three and three-quarters minutes before said collision (being three and five-sixths miles away), dead ahead.

At twenty-two and one-half minutes before said collision (being three and five-eighths miles away), dead ahead.

At twenty-one and one-quarter minutes before said collision (being three and three-sevenths miles away), one-half a point off the starboard bow.

At twenty minutes before said collision (being three and two-ninths miles away), one-half a point off the starboard bow.

At eighteen and three-quarters minutes before said collision (being three miles away), one-half a point off the starboard bow.

libellant, and decreeing that the Tacoma Mill Company recover from the claimant of the ship and from its stipulators

---

At seventeen and one-half minutes before said collision (being two and three-quarters miles away), one-third of a point off the starboard bow.

At sixteen and one-quarter minutes before said collision (being two and five-eighths miles away), one-eighth of a point off the starboard bow.

At fifteen minutes before said collision (being two and two-fifths miles away), one-twelfth of a point off the starboard bow.

At thirteen and three-quarters minutes before said collision (being two and one-seventh miles away), dead ahead.

At twelve and one-half minutes before said collision (being two miles away), one-third of a point off the port bow, the ship bearing three-tenths of a point off the port bow of the tug and showing her red light to both the tug and bark, the bark bearing three-tenths of a point off the port bow of the ship.

At eleven and one-quarter minutes before said collision (being one and three-fourths miles away), one-half a point off the port bow, the ship bearing one-third of a point off the port bow of the tug and showing her red light to both the tug and the bark, and the bark bearing four-tenths of a point off the port bow of the ship.

At ten minutes before said collision (being one and four-sevenths miles away), five-eighths of a point off the port bow, the ship bearing four-tenths of a point off the port bow of the tug and showing her red light to both the tug and the bark, and the bark bearing from the ship five-ninths of a point off her port bow.

At eight and three-quarters minutes before said collision (being one and one-third miles away), one-half of a point off the port bow, the ship bearing one-half of a point off the port bow of the tug, showing her red light to both the tug and the bark, and the bark bearing one-half of a point off the port bow of the ship.

At seven and one-half minutes before said collision (being one and one-seventh miles away), one-sixth of a point off the port bow, the ship bearing two-thirds of a point off the port bow of the tug and showing her red light to both the tug and the bark, the bark bearing one-eighth of a point off the port bow of the ship.

At six and one-quarter minutes before said collision (being nine-tenths of a mile away), dead ahead, the ship bearing two-thirds of a point off the port bow of the tug and showing both of her lights to both the tug and the bark, the bark bearing one-tenth of a point off the starboard bow of the ship.

At five minutes before the said collision (being five-sevenths of a mile away), dead ahead, the ship bearing three-fourths of a point off the port bow of the tug and showing both her lights to the tug and her green light to the bark, the bark bearing one-sixth of a point off the starboard bow of the ship.

$12,121.02 and costs to be taxed, and that execution issue therefor. On the same day, in open court, the claimant of the

At three and three-quarters minutes before said collision (being one-half of a mile away), dead ahead, the ship bearing five-sixths of a point off the port bow of the tug and showing both of her lights to the tug and her green light to the bark, the bark bearing one-sixth of a point off the starboard bow of the ship.

14. That two and one-half minutes before the said collision, said tug being about one-third of a mile distant from said ship and one-half a point off her port bow, the ship bearing about one and three-eighths points off the port bow of the tug and showing both her lights to the bark and her red light to the tug, and the bark bearing dead ahead from the ship, said tug, for the purpose of avoiding the ship, put her helm hard-a-port and swung to starboard, but the said ship immediately thereafter, instead of keeping her course or putting her helm to port, either of which she could and one of which she should have done, and either of which would have avoided said collision, carelessly, unskilfully and negligently put her helm hard-a-starboard and kept the same in that position until the said collision occurred.

15. That the red lights of both said tug and said bark were visible to and were seen by those on board of said ship from ten to twelve minutes before said collision.

16. That although said lights of both said tug and said bark were properly set and brightly burning, such were the relative positions of said ship, said tug and said bark that neither said tug nor said bark at any time up to the time of the collision showed the said ship any side or colored lights except said red lights.

17. That owing to the putting of said helm of said ship to starboard as aforesaid said ship slewed rapidly around to port until her course was changed to about north-northeast, and she then, at about 2 o'clock in the morning of said 11th day of June, while the tug was still swinging to starboard under a ported helm, collided with said tug, striking her "bow on" on the port side just abaft of midships, thereby causing great damage to the hull of said tug, her machinery, tackle, apparel and furniture.

18. That had said ship kept her course or had her helm been put to port at the time it was put to starboard said collision would have been avoided, and no injury would have been occasioned to either said ship, said tug or said bark.

19. That no special circumstance at any time mentioned herein existed which rendered a change of course on the part of said ship necessary or excusable.

20. That as soon as it was possible for those on board of said tug to discover that said ship had put her helm to starboard everything was done on said tug to avoid said collision and lessen the damage occasioned thereby, and at the time of said collision said tug, owing to said port helm, was heading about north-northwest.

ship and her owner D. O. Mills, the cross-libellant, and the stipulators, took an appeal to this court, which was allowed.

21. That up to the time that said ship's helm was put to starboard as aforesaid no one on board of said tug had any reason to expect or anticipate any change of course on the part of said ship, and after the helm of said ship was so put to starboard nothing that said tug could have done would have averted said collision.

22. That the mate of said tug was a competent person for that position and faithfully performed his duties at all times mentioned in these findings, but he had no license.

23. That said collision was caused and all the damage resulting therefrom was occasioned solely by the negligence, want of skill and improper conduct of the officers and persons navigating said ship Blue Jacket, and not from any fault, negligence or improper conduct on the part of any person on board the said steam-tug Tacoma.

24. That the side lights of said ship Blue Jacket were at all times herein mentioned brightly burning, but were not placed or constructed so as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass or so fixed as to throw a light from right ahead to two points abaft the beam on the side of the ship on which said lights were respectively placed; but these facts in nowise contributed to said collision.

25. That said steam-tug Tacoma had no such lookout as is required by law ; but this fact in nowise contributed to said collision.

26. That said ship was well officered and manned and had the usual number of officers and seamen on board.

27. That said steam-tug was damaged by said collision in the sum of seventy-five hundred dollars, and the said libellant has in consequence of said damage been obliged to expend and has expended in repairing the same the sum of seventy-five hundred dollars, the last of which said sum was so paid on or prior to the 15th day of August, 1885, and that said libellant is entitled to interest at the rate of ten per cent per annum upon said sum from said 15th day of August, 1885, to this day.

28. That said libellant, the Tacoma Mill Company, by reason of said collision, has sustained damages by being deprived of the services and use of said tug for the period of fifty days immediately following said collision, and the said services and use were during said period of fifty days reasonably worth the sum of forty-seven and fifty-hundredths dollars per day over and above all expenses of running and operating the said tug.

29. That on the 4th day of September, 1885, J. Furth and Bailey Gatzert entered into a stipulation, in accordance with the rules and practice of the said district court, in the sum of twenty-four thousand dollars, for the release of said ship Blue Jacket from arrest in this cause; which said stipulation was conditioned that said claimant should abide and pay the money awarded in the final decree rendered in this cause by the district court, or, in case of appeal, by the appellate court.

Opinion of the Court.

It was contended in the lower court, as set forth in the answer and the cross-libel on the part of the ship, that the col-

30. That on the 22d day of March, 1887, J. Furth and Bailey Gatzert entered into a stipulation, in accordance with the rules and practice of the said district court, in the sum of twenty thousand dollars upon an appeal from the said district court to this court; which said stipulation was conditioned that the said stipulators should pay all damages and costs that should be adjudged against the said ship on said appeal, and also that said ship should satisfy and perform the decree appealed from, in case it should be affirmed, and any judgment or order which this court might render or order to be rendered by the district court, not exceeding in amount or value the said sum of twenty thousand dollars.

*Additional Findings Requested by the Proctor for the Appellants and Adopted by the Supreme Court.*

1. The master of the tug went to bed a little after midnight preceding the collision, and the acting mate was alone in the pilot-house of the tug, and was the only officer in charge of the navigation of the tug and the only person in charge of the tug's wheel from midnight until one minute or less before the collision, when the captain arrived on deck [but this fact did not contribute to the collision].

2. The captain was awakened and arrived on deck about one-half a minute before the vessels came together, and, after inquiring what the trouble was, and being told a ship was coming into them, ordered the mate to stop and reverse, which order was only partly obeyed by the mate, who rang the bells in obedience to the order sufficient to stop the engines, but not to reverse them, and then let go of the bell-pull and of the wheel and ran out of the pilot-house to avoid danger to himself, which he supposed to be imminent, as the ship was then coming in contact with the tug.

3. For some time prior to and until the captain ordered the mate of the tug to stop and reverse, the engines of the tug were going ahead at full speed, and the tug was making the speed hereinbefore found of two miles an hour by the shore.

And from these findings of fact the court makes the following—

*Conclusions of Law.*

1. That said tug was not in fault or in anywise blamable for any damage resulting either to herself or said ship.

2. The said ship was in fault in this:

First. She did not keep a sufficiently steady helm, but allowed herself to swing alternately to port and starboard before she put her helm hard-a-starboard.

Second. She put her helm hard-a-starboard when she should have put it hard-a-port or kept her course.

3. That said libellant, the Tacoma Mill Company, is entitled to recover of and from F. F. Percival, the claimant in this cause, and from J. Furth

lision resulted through the fault of the tug, entitling the ship
to damages. It is urged here that, although by finding 23 it is
found that the collision and all resulting damages were "occa-
sioned solely by the negligence, want of skill and improper
conduct of the officers and persons navigating said ship Blue
Jacket, and not from any fault, negligence or improper con-
duct on the part of any person on board the said steam-tug
Tacoma," yet there are express and specific findings which not
only fail to sustain the general deduction in finding 23, but
demonstrate that the faults or misconduct resulting in the col-
lision were mutual, if not entirely those of the tug, and that
such findings, like special verdicts, overcome the general find-
ings and are controlling; that it is found by finding 24 that
the side lights of the ship were at all times brightly burning,
but were not placed or constructed so as to show a uniform
and unbroken light over an arc of the horizon of ten points of
the compass, or so fixed as to throw a light from right ahead
to two points abaft the beam on the side of the ship on which
said lights were respectively placed, but that those facts in
nowise contributed to the collision; that it is found by finding
26 that the ship was well officered and manned, and had the
usual number of officers and seamen on board; that it is found
by finding 12 that the tug was first sighted by the lookout of
the ship about half an hour before the collision, at five miles
distance; that that demonstrates the vigilance of the lookout
of the ship; that it is found by finding 10 that the mean
course of the ship up to the time her helm was put hard-a-star-
board was east-northeast, but her course was really along a
swinging path deviating alternately to starboard and port
about one-half a point each way from said mean course, and
crossing the same about every half-mile, at intervals of about

---

and Bailey Gatzert, his stipulators, the sum of twelve thousand one hun-
dred and twenty-one dollars & 2-100 ($12,121.02) and its costs and disburse-
ments to be taxed, and is entitled to an order that execution issue upon
said judgment against the goods, chattels and lands of said claimant and
stipulators.

4. That said libellant is entitled to a decree dismissing the cross-libel at
the costs of the cross-libellant.

every four minutes, up to the time her helm was put hard-a-starboard, which was done when the ship was on the port side of said mean course; and that by finding 2 of the conclusions of law it was found that the ship was in fault in that (1) she did not keep a sufficiently steady helm, but allowed herself to swing alternately to port and starboard before she put her helm hard-a-starboard, and (2) that she put her helm hard-a-starboard when she should have put it hard-a-port or kept her course.

It is urged for the ship that the equality of deviations of about one-half a point to the right and left of her mean course, and the uniformity of their occurrence, suggests that they were unavoidable and were constantly being corrected; that this was due to the fact that she was moving with the wind and was doubtless receiving it somewhat irregularly, as she was fifty miles from the ocean and was borne with a three-mile tide, forced through a contracted channel; that the Supreme Court of the Territory attached little if any significance to its three additional findings of fact, and did not consider their effect upon any of the findings which preceded them; and that the specific findings overcome the conclusion in finding 23, that the collision was not occasioned by any fault, negligence or improper conduct on the part of any person on board of the tug, and the conclusion in finding 20, that when the collision was impending everything was done on the tug to avoid it and lessen the damage.

Attention is also called to the fact that it is found in finding 22, that, although the mate of the tug was a competent person for the position and faithfully performed his duties at all times mentioned in the findings, yet he had no license; and that it is found in finding 25 that the tug had no such lookout as is required by law, although that fact in nowise contributed to the collision. Attention is also called to the findings in additional finding 1, and to the fact found in additional finding 3, that until the captain of the tug ordered her mate to stop and reverse her engine, as set forth in additional finding 2, the tug was going ahead at full speed and making two miles an hour by the shore against a three-mile tide; and that nothing was done in slowing, stopping or reversing

her engine until that was done which is set forth in additional finding 2.

It is also urged that if the ship was moving in a swinging path and was in fault in so doing, the tug had been afforded ample opportunity of observing the ship's course and had many miles of sea room in which to give her a wide berth, instead of which the tug held to her course with her engine at full speed until the vessels were brought near to each other; and that such conduct on her part, with the fact found in finding 25 that she had no such lookout as is required by law, while an unlicensed mate had the sole control of her, and her captain was asleep, showed the grossest recklessness. Attention is also called to the facts, that the course of the ship, subject to the swinging irregularity before mentioned, was, until about two and a half minutes before the collision, east-northeast, while the tug was steering west-southwest one-half west, and was moving along a path west one-half south; that the combined speed of the two vessels in approaching each other was ten miles an hour by the land; that the finding is that the vessels were about one-third of a mile apart, and the tug one-half a point off the ship's port bow, and the ship bearing one and three-eighths points off the port bow of the tug, when the tug put her helm hard-a-port, and swung to starboard, and that immediately thereafter the ship put her helm hard-a-starboard, the effect of which was to change the ship's course to about north-northeast, and that of the tug to about north-northwest, and while the vessels were on these converging courses, the ship struck the tug bow on, on the port side of the tug, just abaft of midships; that these findings demonstrate that if the tug had slowed on nearing the ship, or had stopped and reversed her engine after the ship changed her course, the latter would have crossed the tug's course in advance of the tug without injury to either vessel; and that, if there had been a competent lookout on the tug, or if her captain had come on deck two minutes instead of one-half a minute before the collision, and had then given the order to stop and reverse, and that order had been promptly obeyed, or if the mate, at any time in several minutes, had done what the captain at the

last instant recognized as the tug's duty, namely, to stop and reverse, the accident would have been avoided.

It is also said for the ship that, for the purposes of this appeal, it may be considered that she was in fault in not keeping her course, although the conduct of those in charge of the tug, as established by the findings of fact, goes far to show that the ship's situation was one of embarrassment, and was reasonably believed to be one of extremity, requiring her to change her course to avoid collision, yet those in charge of the tug cannot escape the responsibility of their negligence and misconduct in failing to have a proper lookout, and recklessly keeping on at full speed until the vessels were so near together that the mate of the tug abandoned the wheel and the pilot-house, only before doing so ringing the bells sufficiently to stop the engine but not to reverse it. It is also urged that the determination of eighteen relative positions of the colliding vessels, given in findings 13 and 14, beginning twenty-three and three-quarters minutes and ending two and one-half minutes before the collision, must all fail, if there was any mistake in the premises or calculation of the court, and that the conclusion must be that the facts thus found are theoretical and speculative. It is also contended that the only misconduct to be charged against the ship, in the light of the special findings, was in changing her·course; but that that was to be excused by the misconduct of those in charge of the tug, leading the ship into embarrassment and causing those in charge of her to believe that she was in extremity and was compelled to change her course; and that, therefore, she ought to be relieved from liability, while the tug cannot escape an apportionment of the damages to which her fault contributed, including those suffered by the ship and set forth in her answer and her cross-libel.

But we are of opinion that the foregoing contentions are of no avail in favor of the ship, against the findings of fact of the Supreme Court of the Territory. We think that the additional findings made by that court do not modify the findings made by the District Court, and that, therefore, the findings of fact and conclusions of law made by the two courts are substan-

tially identical. There is no bill of exceptions, and, therefore, the only question is whether the findings of fact made by the Supreme Court support the conclusions of law which it made.

The navigation rules in force June 11, 1885, when this collision occurred, were those established by the act of March 3, 1885, c. 354, 23 Stat. 438. That statute provides as follows:·

"Art. 17. If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship.

"Art. 18. Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or stop and reverse, if necessary."

"Art. 22. Where by the above rules one of two ships is to keep out of the way, the other shall keep her course.

"Art. 23. In obeying and construing these rules, due regard shall be had to all dangers of navigation, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger.

"Art. 24. Nothing in these rules shall exonerate any ship, or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case."

In the present case, therefore, the steam-tug was required to keep out of the way of the ship, and the ship was required to keep her course. The tug adopted proper measures, by porting her helm, to avoid the ship, and those measures would have been effectual if the ship had not changed her course by starboarding her helm. Finding 14 finds that 2½ minutes before the collision, when the tug and the ship were about one-third of a mile apart, and the tug bore about one-half a point off the port bow of the ship, and the ship bore about 1⅜ points off the port bow of the tug and showed both of her lights to the bark and her red light to the tug, and the bark bore dead ahead from the ship, the tug, for the purpose of avoiding the ship, put her helm hard-a-port and swung to starboard, and that the

ship immediately thereafter, instead of keeping her course or putting her helm to port, either of which she could have done, and one of which she should have done, and either of which would have avoided the collision, negligently put her helm hard-a-starboard, and kept it in that position until the collision occurred. It is also found, by finding 18, that if the ship had kept her course or her helm had been put to port at the time it was put to starboard, the collision would have been avoided; by finding 19, that no special circumstance existed at any time mentioned, which rendered a change of course on the part of the ship necessary or excusable; by finding 20, that as soon as it was possible for those on board of the tug to discover that the ship had put her helm to starboard, everything was done on the tug to avoid the collision and lessen the damage; by finding 21, that up to the time the helm of the ship was put to starboard no one on board of the tug had any reason to expect or anticipate any change of course on the part of the ship, and that after the ship's helm was put to starboard, nothing that the tug could have done would have averted the collision; by finding 22, that the mate of the tug was a competent person for that position, and faithfully performed his duties at all times mentioned in the findings, although he had no license; by finding 23, that the collision was caused and all the damage resulting therefrom was occasioned solely by the negligence, want of skill and improper conduct of the officers and persons navigating the ship, and not from any fault, negligence or improper conduct on the part of any person on board of the tug; by finding 24, that no misplacement or fault of construction in the side lights of the ship contributed to the collision, and that they were at all times brightly burning; and by finding 25, that, although the tug had no such lookout as was required by law, that fact in nowise contributed to the collision.

It is well settled that the absence of a lookout is not material, where the presence of one would not have availed to prevent a collision. In the case of *The Nacoochee*, 137 U. S. 330, the collision was between a steamer and a schooner, and the claim was made that the schooner was in fault in sailing too

shorthanded in a fog and having only two men on deck, one of them forward, charged with the double duties of a lookout and of blowing the horn, and one astern, at the wheel. It was not found by the Circuit Court as a fact that the absence of another lookout contributed to the collision, nor were there any facts found which could justify that conclusion, either as fact or law. So far as the findings were concerned, the man forward properly discharged his double duties. He blew the fog-horn, and it was heard on board of the steamer; and it was not found that he did not blow it properly, or that he could have performed the duties of a lookout better than he did, or that any different manner of performing those duties, either by him or by an additional lookout, could or would have made any difference in the result, or that the steamer could or would have been seen by the schooner any sooner than she was seen. This court held that, under all the circumstances and in view of the actual findings, it could not be said that there was any lack of vigilance on the part of the schooner in the matter of a lookout; and the cases of *The Farragut*, 10 Wall. 334; *The Fannie*, 11 Wall. 238, 243; and *The Annie Lindsley*, 104 U. S. 185, 191, were cited in support of that view.

In the present case, it is found that the lookout of the tug first sighted the ship at about two miles distant, and that the red light of the ship was then seen about three-tenths of a point on the port bow of the tug; and it is also found that although the tug had no such lookout as was required by law, that fact in nowise contributed to the collision.

The provision of article 24 of the act of March 3, 1885, is that a vessel is not to be exonerated from the consequences of any neglect to keep a proper lookout. It does not say that a vessel shall, because of not keeping a proper lookout, be visited with the consequences of a collision. If the collision does not result as a consequence of neglecting to keep a proper lookout, the vessel is not thereby made responsible for the consequences of the collision, and the exemption of the tug necessarily results from the finding as a fact that the absence of the proper lookout in nowise contributed to the collision.

As it is found as a fact that no special circumstance at any

time existed which rendered a change of course on the part of the ship necessary or excusable, under article 23 of the statute, she cannot have any benefit from that article. *The Maggie J. Smith,* 123 U. S. 349, 354.

We think that the keeping on of the tug at the full speed of two miles an hour by the shore, and her not stopping or reversing her engine until the captain, coming on deck, ordered the mate to do so, was not a fault on the part of the tug. Knowing that the ship was a sailing vessel, from her showing to the tug only her red light and no white light, and further knowing that it was the duty of the tug to avoid the ship and of the ship to keep her course, and supposing that the ship would keep her course, and the tug having ported her helm in discharge of her duty of avoiding the ship, she naturally kept on without stopping or reversing, because, under article 18, it was her duty to slacken her speed, or to stop and reverse, if necessary, only if her approach to the ship involved risk of collision. There was no risk of collision involved until the ship starboarded, which she did only after the tug had hard-a-ported her helm and had swung to starboard; and then the peril was so great and the vessels were such a short distance apart that the tug may well be considered as having been *in extremis.*

By finding 14, it is found that the tug put her helm hard-a-port and swung to starboard only 2½ minutes before the collision, and when the vessels were about one-third of a mile apart. They were approaching each other at the rate of about ten miles an hour, the tug going about two miles an hour by the land, and the ship about eight miles an hour by the land. The approach was at the rate of a mile in about six minutes. As the tug began to port only 2½ minutes before the collision, and had to get her helm hard-a-port and swing to starboard, before the ship starboarded, then got her helm hard-a-starboard, and then changed her course so materially as to attract the attention of the tug, the fair deduction from the findings is that the tug was in the situation of *in extremis* before the time when it became her duty to stop and reverse. It was the fault of the ship in changing her course that put the tug in that situation, and any error of judgment at that

time, in the particular mentioned, cannot be imputed as a fault to the tug. *The Benefactor*, 102 U. S. 216; *The Elizabeth Jones*, 112 U. S. 514, 526, and cases there cited; *The Maggie J. Smith*, 123 U. S. 349.

As was held in *The Bywell Castle*, 4 Prob. Div. 219, "where one ship has, by wrong manœuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been manœuvred with perfect skill and presence of mind."

It is not found as a fact that the collision would have been avoided or mitigated if the tug had stopped and reversed when she discovered that the ship had put her helm hard-a-starboard and changed her course. On the contrary, finding 21 says that after the ship's helm was put to starboard, nothing that the tug could have done would have averted the collision; and finding 20 says that as soon as it was possible for those on board of the tug to discover that the ship had put her helm to starboard, everything was done on board of the tug to avoid the collision and lessen the damage.

We do not think that the decision in the case of *The Manitoba*, 122 U. S. 97, applies to the present case. That was a collision between two steam vessels on Lake Superior. The two vessels saw the white and the green lights of each other, and only those lights, and continued to approach each other on nearly parallel courses. When they were about from 1½ to 2 miles apart, the Manitoba had the Comet's green light about three-quarters of a point on her starboard bow, and then starboarded her wheel half-a-point and continued her course without change until just before the collision. In the meantime, the Comet ported her wheel for the second time half-a-point, and the two vessels thus continued to approach each other, showing their green and white lights only, until they had come within from 400 to 500 feet of each other, the Comet being then from 200 to 300 feet on the starboard side of the Manitoba. If each had kept her course, they would have passed without colliding; but at that juncture the Comet ported her wheel, displayed her red light and suddenly sheered across the course of the Manitoba, the latter thereupon starboarded

her wheel, and the collision ensued. The combined speed of the two vessels was about twenty miles an hour. Neither of the vessels sounded any signal of the whistle, indicating the side she intended or desired to take, nor did either of them reverse her engine or slacken her speed until the collision was inevitable; but the Manitoba reversed her engine just before or about the time of the collision. The fact that the two vessels were moving on nearly parallel, opposite, but slightly converging lines, was manifest to the officers of both for some considerable time before the Comet ported. The Circuit Court found as follows: "The relative courses of these vessels, and the bearing of their lights, and the manifest uncertainty as to the Comet's intentions, in connection with all the surrounding facts, called for the closest watch and the highest degree of diligence, on the part of both, with reference to the movements of the other; and it behooved those in charge of them to be prompt in availing themselves of any resource to avoid, not only a collision, but the risk of such a catastrophe. If the requisite precautions had been observed by both or by either of said vessels, the collision, in the opinion of the court, would not have happened." The Circuit Court found that the Comet was in fault for putting her wheel hard-a-port and endeavoring to cross on the port side of the Manitoba; that the Manitoba was in fault in ignoring the fact that the Comet was approaching under a port wheel, and that the courses of the vessels were convergent and involved risk of collision, and in failing to take proper precaution in time to prevent the collision; and that the Manitoba was further in fault in not indicating her course by her whistle, and in not slowing up, and in failing to reverse her engine until it was too late to accomplish anything thereby. It apportioned the damages. The Manitoba appealed to this court because she had been found to be in fault. As the answer and the cross-libel of the Manitoba charged as a fault in the Comet that she did not stop and reverse in approaching the Manitoba, when there was risk of collision, this court said, that if there was risk of collision in the approach of the Comet towards the Manitoba, prior to the sudden sheer of the Comet, it was a risk affecting

the Manitoba equally with the Comet, and imposing upon her the same duties as it imposed on the Comet, of slackening speed, or, if necessary, stopping and reversing. This court affirmed the finding, as a conclusion of law, that the Manitoba was in fault in not indicating her course by her whistle, and in not slowing up, and in failing to reverse her engine until it was too late to accomplish anything thereby.

The difference between the case of *The Manitoba* and the present case involves the vital point, that, in the former, the question was between two steam vessels, while in the latter, it is between a steam vessel and a sailing vessel. In the case of *The Manitoba,* the courses of the two steam vessels were not such as to make it the duty of the one more than of the other to avoid the other, or to make it the duty of the one rather than of the other to keep her course ; and there was, in regard to the courses of both the steam vessels, such risk of collision that the obligation was upon both to slacken speed, or, if necessary, stop and reverse. But in the present case, the duty was wholly on the ship to keep her course, and wholly on the tug to keep out of the way of the ship ; and there was no duty imposed on the tug to stop and reverse until, as above shown, she was in the very jaws of the collision.

The decree of the Supreme Court of the Territory of Washington is

> *Affirmed, and the case is remanded to the Circuit Court of the United States for the District of Washington, (Act of February* 22, 1889, c. 180, 25 *Stat.* 676, 682, 683, §§ 22, 23,) *for further proceedings according to law.*