## ROSS v. MERCHANTS' & MINERS' TRANSP. CO.

(District Court, D. Rhode Island. January 30, 1900.)

ADMIRALTY— COLLISION—NEGLIGENCE.

At a point in a river where the dredged channel was 400 feet wide, a string of scows was anchored, the anchor being some 50 feet outside the channel, to the west thereof, and the distance therefrom to the stern of the last scow being between 375 and 400 feet. The incoming tide swung them directly across the channel. There was no light on any of them, unless on the one nearest the anchor; and the preponderance of the evidence was that there was none on it, the officers of five steamers going down the river during the night, with proper lookouts, testifying that there was none. Four of these steamers, three of them drawing not over 8 feet of water, and the other 13 feet, avoided the tow by making a sharp deviation to the eastward, the latter having barely room to get by, and her stern narrowly clearing some rocks. Immediately on report of the scows by the lookout of the fifth steamer, which was heavily loaded and drew 17½ feet of water, her engines were reversed, her helm put to port, and she struck the scow nearest the anchor. *Held*, that no fault of such steamer contributed to the collision, even if the perilous alternative of going to the eastward might have been more fortunate.

In Admiralty.

Robert D. Benedict and Dexter B. Potter, for libelant.
Daniel H. Hayne and Archibald C. Matteson, for claimant.

BROWN, District Judge. This libel is for the sinking of scow No. 4 by the steamer Chatham on the night of September 3, 1897, at about 11 o'clock, in the Providence river, just above Pomham Light. The steamer was going down the river. The scow was one of a string of four empty scows at anchor. It is very clear that the libelant was negligent in the anchoring of these scows, and that on that night they were a dangerous and unnecessary obstruction to the navigation of the narrow and frequented channel. The anchor was placed very close to the western edge of the channel. Scow No. 4 was fastened to the anchor by a cable with one scow alongside. Scow No. 6 was fast to the stern of No. 4, and scow No. 12 was fast to the stern of No. 6. The total distance from the anchor to the stern of the last scow was not less than 375 feet, and probably not much over 400 feet. The libelant claims that the anchor was 75 or 100 feet to the west of the western edge of the channel. In a letter written by him about three months after the collision he stated that it was 50 feet to the west. The dredged channel at this point is about 400 feet wide, with a depth of at least 25 feet. There is abundant evidence that the string of scows lay directly across the usual course of steamers. They were left to swing freely with the tide, which was coming in, and would naturally throw them across the middle of the channel. In view of the direct evidence as to their actual location, it is evident that the wind, which was very light, and from the northeast, was not sufficient to prevent their swinging with the tide. They were from 1,000 to 1,300 feet above Pomham Light, just below which the channel makes a sharp turn. Four steamers went down the channel before the Chatham, and each was compelled to make a

sharp deviation from the usual course, in order to avoid the scows, going to the eastward. So little room was there to the east that the Pilgrim had barely room to get by, her stern narrowly clearing Pomham Rocks by some 25 feet. The Mt. Hope passed within 25 or 30 feet of the rear scow, and her master says that he was then right over the eastern edge of the channel. The testimony from the officers of the steamers Pilgrim, Mt. Hope, Baltimore, and Whatcheer is in itself sufficient to establish the negligence of the libelant in anchoring, and entirely corroborates the testimony from the Chatham that the scows were directly in the proper course. It is also clear that the libelant was at fault in the matter of lights. The evidence for the libelant on this point is inconsistent and unsatisfactory. The libel avers "that said scows were well and properly moored, and scow No. 4 had a proper light set and burning." In a letter written by the libelant December 12, 1897, he stated, "My scow anchorage had the proper light exposed," and that the Chatham "ran into the first scow, or the one having the light on it." Capt. Jaycox, of the tug attending the scows, aboard which were kept the lanterns for the scows, says distinctly that but one light was put on the scows, and that on No. 4. Other witnesses for the libelant testify to two lights,—one on each end of the tow. The preponderance of the evidence for the libelant is to the effect that but one light was placed on the scows. This, with the evidence for the defense, establishes the fact that the two rear scows were without lights, in direct violation of law. Upon the question whether the sunken scow, No. 4, carried a light there is greater conflict. I am of the opinion, however, that by a preponderance of evidence it appears that there was no light on any of the scows at the time of the collision. The evidence for the libelant is to the effect that a lantern, properly filled, was lighted, and placed on scow No. 4, at about 4 o'clock in the afternoon. From that time on no person was aboard the scows. In The Westfield (D. C.) 38 Fed. 366, it was said:

"Where competent officers are in their places, attentive to their duties, and navigating their vessel according to what can be seen, their testimony that no light was seen which ought to have been seen and must have been seen if properly burning, is entitled to superior credit if their evidence is not outweighed by other circumstances."

In the present case we have not only the evidence from the Chatham, but the confirmatory evidence from four other steamers, that there were no lights on the scows. This is testimony of the highest character, and is supported by the presumption that in this narrow and frequented channel the officers of these steamers performed their duties with the usual degree of diligence required at that part of the passage down the river.

The libelant contends that, wherever was the anchorage, and whatever the direction of the scows as they lay, and whether they were lighted or not, the Chatham should have avoided the scows. The argument is that, because the other steamers passed in safety, the Chatham should have done so, and that the only cause that can be suggested for her failure to avoid a collision is that she did not keep a diligent lookout. But there is most satisfactory evidence that a

proper lookout was maintained. The lookout was at his proper station, and was attentive to his duties. In the pilot house were the quartermaster at the wheel, the master, and the first officer; the latter using marine glasses. The steamer was on a proper course, running at a proper speed, and, though the libelant has carefully criticised her conduct in every particular, I am satisfied that she was in every respect performing her duty. Under the circumstances, the fact that a collision occurred does not afford even prima facie evidence of negligence. It cannot be inferred that the Chatham did not see the scows as soon as did the other vessels, simply because she did not try to avoid the scows by going to the eastward. Excepting the Pilgrim, the other steamers were smaller river boats, capable of being very easily and quickly handled. None of them drew over 8 feet of water. The Pilgrim drew but 13, while the Chatham was a screw steamer, heavily loaded, and drew 17 feet and 6 inches. That the Chatham did not choose to accept the risk of going on the rocks to the eastward is evidence neither of a failure to keep a good lookout nor of unskillful navigation. Immediately upon the report of the scows by the lookout, she reversed her engines, and put her helm to port. It is by no means certain that it was not the best thing for her to do, as she was not capable of as quick handling as the side-wheel steamers, and her chance of clearing the rocks to the east was a doubtful one. But, even if it were not, the libelant, by his inexcusable negligence, had placed the Chatham in such a situation that she must choose between perilous alternatives. The fact that an order other than that which was given might have been more fortunate would be insufficient to put the Chatham in fault. The Maggie J. Smith, 123 U. S. 349, 355, 8 Sup. Ct. 159, 31 L. Ed. 175; The Blue Jacket, 144 U. S. 371, 393, 12 Sup. Ct. 711, 36 L. Ed. 469. I find, therefore, that the collision was due wholly to the faults of the libelant. The libel will be dismissed, with costs to the libelee.