**UNITED STATES v. THE ADRASTUS et al.**

**OCEAN S. S. CO., Limited, v. UNITED STATES.**

**THE GEORGE WESTINGHOUSE.**

**Nos. A140–29 and A140–235.**

United States District Court
S. D. New York.

Feb. 7, 1949.

John F. X. McGohey, New York City (Edward R. Downing, Special Atty., Brooklyn, N. Y., of counsel), for libelant and cross-respondent.

Haight, Griffin, Deming & Gardner, New York City (John W. Griffin and David L. Corbin, New York City, of counsel), for respondent and cross-libelant.

JAMES ALGER FEE, District Judge.

This is a suit in admiralty which arises out of a collision between the steamers Adrastus and George Westinghouse, off Nova Scotia in the North Atlantic, during the early morning of January 16, 1944. Cross libels have been filed for the collision. The Adrastus sustained some damage to her bow, and the Westinghouse had a hole in her starboard side and suffered some loss of cargo. There are mutual charges with faults in regard to lookouts, speed, lights, whistles and failure to follow prescribed route. The Adrastus charges Westinghouse attempted to cross The Adrastus' bow and failed to reverse or pass under The Adrastus' stern. Each vessel denies the charges of the other. The Adrastus also pleads limitation of liability statutes.

The Adrastus is a British steamer, which was a part of a large convoy crossing the North Atlantic. Some time about noon, January 15, she was detached with orders to proceed without escort at full speed to St. John, New Brunswick, through 43° 15′N and 66° 30′W. Her course in daylight was zigzag, and at night she was blacked out. She was carrying out these orders at the time of the collision. No intimation had been given to Adrastus that a convoy was in her course.

The George Westinghouse was a liberty ship under the United States flag. She was proceeding in a two ship convoy from St. John, New Brunswick, to England by Halifax, Nova Scotia. At night she was blacked out. The Commodore Elk Island Park was the starboard ship, and The Westinghouse was port vessel. The convoy was escorted by the corvette Bayfield, owned by the Canadian Government. The Westinghouse had three lookouts, who were

stationed on the bow, the forward gun tub and the flying bridge. There were also lookouts on the port and starboard quarters. The second mate was on the starboard wing of the bridge. The speed of The Westinghouse was about ten and one-half knots.

The Westinghouse had received written and oral naval control routing instructions from the Canadian Navy at a conference in St. John, which directed the convoy to proceed through certain positions. There is a conflict in testimony as to the exact position of the collision and a debate as to whether the convoy passed through Point "O".[1] The more credible view is that, according to instructions from the Bayfield and the Commodore, The Westinghouse al-

1. The attached map illustrates the theory of The Adrastus as to the collision, which the court accepts as approximately correct.

tered course at 9:00 p. m.[2] to 90° true, and that she did not pass through position "O", that at 2:00 a. m., just before the collision, the course was altered to 52° to avoid a westbound convoy. The secret log book and the message book of The Westinghouse were not produced at the trial, and no satisfactory explanation is given for their absence.

The Adrastus was proceeding at a speed of fourteen and one-half knots. Her second officer, extra third officer and helmsman were on her bridge. There was a lookout on the monkey island, but there was none on the bow. Gunners were stationed as aft lookouts on the stern.

The weather was dark and overcast, wind north-northeast, force 3, accompanied by a slight sea. There is a dispute as to the amount of snow. The court finds that a light snow was falling generally at about the time of the collision and that there were snow squalls. At about 1:57 a. m., the Commodore Elk Island Park displayed navigation lights and flashed signal lights for change of course. About three minutes later, the second stage of course change followed. Thereafter The Westinghouse was on the designated course of 52° true. The Elk Island Park was about 2 points forward of the starboard beam and probably one-half mile distant. The Commodore's lights were burning until after the collision. After the turn, to decrease distance from the Commodore, The Westinghouse changed course to 62° true. At about 2:20 a. m., the mate on the starboard wing of the bridge observed an unidentifiable shape bearing about 2 points on the starboard bow at a distance which he could not estimate. The bow lookout sighted this object and tried to telephone the bridge. The telephone bell rang, but it was unanswered. The mate turned on the navigation lights at full brilliancy as soon as he was sure that the loom was not that of the Commodore. The mate came out on the bridge again and, being unable to determine the heading of the object, observed, ran again into the wheelhouse and sounded five short blasts on the

ship's whistle and returned to the starboard wing of the bridge. The engine of The Westinghouse was placed full astern, but this had no appreciable effect before the ships struck.

On The Adrastus just before the collision, the second officer, who was on watch on the port wing of the bridge, crossed to the starboard wing to speak to the extra third officer stationed there. While the officers were talking, nothing having been seen by them and nothing having been reported by the lookout on the monkey island, the stern gunner telephoned and was answered by the second mate. He reported sighting a white light on the port quarter and a green light on the port bow. The extra third officer looked back to see what the lookout had sighted, and saw the lights of The Elk Island Park. As the second officer went to answer the telephone, the extra third officer rushed across the wheelhouse to the port side. This occupied about five seconds. He saw the loom of The Westinghouse about two seconds later after he had changed stations. He testified that she was at that time unlighted. He ordered the helm hard astarboard. Immediately after, he saw the lights of The Westinghouse come on. While the telephone conversation was going on between the second officer and the gunner, the lookout saw the light on the port bow. An order of full astern was given, but was never executed.

The Bayfield, which was a mile and a half away, picked up The Adrastus on the radar some minutes before the collision, but gave no signals and did nothing to prevent the accident.

Within a time certainly less than a minute and variously estimated at 25, 30 and 40 seconds, the two ships struck at an angle of about 38 degrees on their original courses.

 There was an elaborate and efficient system of routing ships across the Atlantic during these perilous times. Orders were given in such a way that the courses would not cross and an opportunity

2. Times stated herein are according to Westinghouse time, which was 3 hours behind Greenwich time. The Adrastus carried Greenwich time minus 4 hours.

for the various escape measures could be employed. The orders to the convoys were positive and had the effect of law. However, ships were not relieved from the duty to have regard for their own navigation as far as consistent with such safety precautions. The Adrastus is therefore absolved for running zigzag courses in daytime and blacked out, full speed ahead at night, even in fog or snow. Similarly, The Westinghouse is absolved from a failure to follow the designated course given on land inasmuch as the deviation was ostensibly made in order to avoid a westbound convoy, of which these vessels had been advised. In any event, The Westinghouse was bound to obey the directions received from the Commodore and cannot be held responsible for that. Likewise, she is absolved for proceeding blacked out and at full speed, even in snow.

■ Therefore, neither of the vessels can be held at fault until we come to appraise the conditions immediately preceding the collision. Certainly, neither can be held responsible for the fact that The Bayfield, in the discharge of her duties as an escort, sounded no signals and gave no warning even after the course of The Adrastus was noted on the radar. The escort's duties were purely military and the precautions required to be taken were only those which related to military security.

The faults charged to The Adrastus, which are of the essence, relate to the lookout which was being kept. In the first place, it was uncontroverted that she had no lookout in her bow—in the eyes of the ship or "as far forward as possible," as the older authorities say.[3] The lookout on the monkey island was a Chinaman, only slightly acquainted with the English language. He was not produced as a witness,[4] and there can only be conjecture as to what his qualifications and intelligence were. In

any event, it is uncontroverted that this Chinese lookout did not report anything to anyone at any time concerning either The Westinghouse or The Elk Island Park. The only reference to him was that his head was observed by the extra third officer as he stood on the monkey island some minutes before the collision.

The attempts to justify this position of lookout savor of sophistical dialectic. It is argued that with the speed of The Adrastus only six seconds would elapse between the time that the bow passed a given point until the bridge passed it. This argument will, of course, not bear scrutiny. It is rather surprising to find that it was made. For, if five seconds[5] sooner the lookout in the bow had located the lights of The Elk Island Park and the lights of The Adrastus had been immediately switched on, the collision might have been avoided. It is then said that the British Naval authorities had recommended that the lookouts be not placed on the bow but rather on the bridge. This depends for validity upon the peril against which the precaution was being taken. It is well known that a higher station was usually of advantage in the watch for submarines, but the universal experience has established the fact that, in order to avoid collision, the lookout should be as far forward as possible. This position is not dogmatic. It is empirical and pragmatic. The authorities are more nearly uniform upon this proposition than on any other feature of maritime law. But it is said that the snow, which was falling, makes all the difference. This position is likewise ruled out by the cases. There is little difference between snow and fog. And normally the worse the weather the more precaution that should be taken to have the lookouts forward where they can see and hear.

3. Chamberlain v. Ward, 21 How. 548, 571, 16 L.Ed. 211. "A competent and vigilant look-out stationed at the forward part of the vessel * * * is indispensable to exempt the steamboat from blame * * *." St. John v. Paine, 10 How. 557, 585, 13 L.Ed. 537.

4. "The failure to produce witnesses * * * may be the result of mishap or misfortune, but these cannot suffice to take the place of absent witnesses who should have been produced." The Georgetown, D.C., 135 F. 854, 859.

5. A "few feet may mean much" under difficult weather conditions, and the lookout should be in the eyes of the ship. The Kaga Maru, D.C., 18 F.2d 295, 298, 299.

There was a further fault in regard to the lookout on The Adrastus. Both The Elk Island Park and The Westinghouse were approaching upon the port side of The Adrastus. As noted above, the second officer had crossed to starboard and was engaged in conversation with the extra third mate at the critical moment. This left the port side unprotected except for the Chinese lookout, who in any event failed to give a signal of the lights of The Elk Island Park bearing down upon the port side. Obviously, the officers, being engaged in conversation, were not vigilant either. Besides, they were not in position to see. It remained for the gunner on the aft part of The Adrastus to give the warning as to both the approaching vessels. Under these circumstances, it is contended that, if an efficient lookout had been maintained by The Adrastus, the collision would not have occurred. The Elk Island Park would have then been discovered earlier and the navigation lights of The Adrastus thrown on. The fact that the only order given was helm hard astarboard, followed by full speed astern, shows that there was no time for the third officer to do more. Indeed, he testified that it was only twenty-five seconds from the time he realized the situation until the collision. Warning to him came late—far too late.

The Westinghouse likewise had faults as regard her lookout. The man on duty had been on duty during the day, which, of course, is an improper practice. Besides that, there was a housing or structure erected in the bow of the ship to protect him from the weather. It is uncontroverted that the lookout should not be hampered by any such hindrances. However, the evidence shows clearly that he did see and report The Adrastus. As to whether this was before or after The Adrastus was seen from the bridge is, in our opinion, doubtful. However, the court holds that these deviations had no relation to the accident.[6]

The first impression of the court at the trial of this case was that no fault was attributable to either vessel which could be considered the cause of the accident. When ships under orders are sailing full speed ahead and blacked out on courses which they have reason to believe will be kept clear, emergency conditions arise suddenly for which they cannot be held to blame. Especially is this true where snow is falling and a more difficult condition created. The change, of course which apparently was dictated by the assumed necessity of avoiding a west bound convoy threw these ships into the jaws of danger. The Westinghouse cannot be held responsible for this change, of course, since she was bound to obey orders. But change of course and the failure of The Bayfield to take action when The Adrastus came upon the radar screen were the primary causes of disaster. The United States had the advantage of battle precaution and should not profit to the disadvantage of The Adrastus thereby.[7] The primary purpose of the lookouts on both vessels in such situations was to avoid and escape submarines. The collision happened very suddenly after each party had discovered the other. In fact, none of the emergency measures taken had any effect. The officers of The Adrastus were not bound instantly upon seeing a loom to decide that it belonged to a friendly ship of which they had been given no notice. If the officers of the Adrastus had seen the lights of The Elk Island Park, they were not bound instantly to decide that they were coming into a friendly convoy rather than discovering a Nazi decoy. The great waters were fraught with danger and this was of them.

6. "A colliding vessel is never exonerated from liability for her failure to keep a lookout, unless it appears that the collision would have occurred notwithstanding such failure." The Eagle, 9 Cir., 289 F. 661, 663. See also The Blue Jacket, 144 U.S. 371, 389, 12 S.Ct. 711, 36 L.Ed. 469; The Columbia, D.C., 104 F. 105, 109; The Bailey Gatzert, 9 Cir., 179 F. 44, 49.

7. If The Westinghouse had been acting alone, she would have been responsible for the deviation without which the collision would not have occurred. Tidewater Associated Oil Co. v. United States, D.C., 60 F.Supp. 376, 386,

This solution is not directly supported by any authorities.[8] Conditions novel and unprecedented were created by orders and regulations which each ship respectively was bound to obey. Reactions which would be almost involuntary in peaceful waters were slowed by brooding peril. Military security was paramount. In fact, the accident was caused by war.

The court will dismiss all proceedings. Form of findings and judgment may be submitted.

8. Some synthetic support can be obtained by a reading of some of the British authorities, but these are not in point. The Chester Sun, 1 Lloyd's List Law Reports 478; The Melita, 4 Lloyd's List Law Reports 105; The Sobieski, 81 Lloyd's List Law Reports 51; The Ganges, 71 Lloyd's List Law Reports 76; The Hoyanger, 79 Lloyd's List Law Reports 284; The Vanity, 79 Lloyd's List Law Reports 594.