## Case No. 7,323.

### The J. L. HASBROUCK.

[4 Ben. 359.] [1]

District Court, E. D. New York. Nov., 1870.[2]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by the circuit court; case unreported. Decree of the circuit court affirmed in 93 U. S. 405.]

C. Donohue and E. M. Cullen, for libellant.

R. D. Benedict and W. J. Haskett, for claimants.

BENEDICT, District Judge. This action is brought to recover the value of the sloop Venus and her cargo, which vessel was sunk by a collision in the Hudson river, on the night of the 27th of November, 1869. The locality of the collision was off West Point, where the river makes two sharp turns in quick succession, one at Magazine Point above, and the other at West Point below. The time of the collision was about midnight, but lights could be seen at a distance of one-half to three-quarters of a mile. The tide was running strong ebb. The Hasbrouck was a propeller bound up the river, at a speed of from seven to eight knots, the Venus was a sloop, bound down the river with a cargo of stone. The vessels came in contact a little below the light at West Point. the bowsprit of the sloop striking the port side of the propeller, about forty feet abaft the stem, nearly at right angles; whereby the sloop was so injured, that she sunk almost immediately. No other vessels were passing at the time, to interfere with the movements of either vessel. Both vessels were displaying the required lights, which were seen as soon as possible. when the lights of the sloop opened around West Point. The sloop was then about in the middle of the river, and not quite down to the point, while the propeller was about one-half a mile below the point, coming up on the east side of the river.

The allegation of the libellants is, that the sloop was sailing on the starboard tack, east-south-east, with the wind .south-west very light; that the propeller approached to within fifty feet of the sloop, heading for the sloop's fore-rigging, when, on being hailed to go under the sloop's stern, she sheered off to east across her bow, and in passing caught the sloop's bowsprit, which was taken out by the force of the blow, and the sloop thus caused to sink.

The allegation of the respondent is, that the wind was north-west, blowing a good stiff breeze; that the sloop, when seen a little above West Point, was exhibiting her starboard light; that as she got around the point, she exhibited a glimpse of her port light, and immediately shut it off again, when a slight sheer to east was given to the propeller. and finding the sloop to be hauling more to east, and across the river, the propeller was stopped, and while motionless was struck by the sloop. And it is charged, that the sails of the sloop were not properly and fully hoisted. and her jib was furled, and therefore she was unable to luff, and so ran across into the propeller.

In order to a correct determination of the points of difference between these parties, it is necessary to bear in mind, the locality of the accident, and the proper course of navigation in passing West Point, as to which there is no room for dispute.

For a steamer, bound up the river in an ebb tide, the true course is, as she approaches West Point, to keep well to eastward, until able to see above the point, then to haul over, passing near the point when above it, so as to give a wide berth in passing Magazine Point above, by which course vessels coming down are seen at the earliest moment, and easily pass in safety, if they keep to the westward side, or middle of the river, as they round West Point.

Such being the well known course of navigation at this point, it was the duty of the sloop in the present instance. if she had a working breeze to enable her to do it, to haul around the point, and allow the steamer to pass her to east. This she did not do, on the contrary, at the time the vessels came in contact. the sloop was well over to the east side of the channel. The sloop was therefore in fault, for being out of her proper course. provided she had a good working breeze from the north-west, to enable her to keep her place. as the claimants allege that she had. A sailing vessel in this locality, does not hold her proper course, within the meaning of the law. when without cause she changes from the west to the east side of the river rounding West Point.

The question of the wind is therefore a material question in the case, and it has been so treated. Some twenty witnesses have been called to testify in regard to it, and their evidence discloses the ordinary conflict so characteristic of this class of cases. The weight of the evidence is however clearly with the respondents. Some seventeen witnesses support the view of the respondents upon this point, ·to five or six upon the other side, and mere numbers must sometimes be considered. But the libellant's own evidence contains facts strongly corroborative of the respondent's statement, in respect to the wind. For instance, the record of the wind, kept at the barracks at West Point, while it shows that at 9 p. m. of the evening before the collision, the wind was light from the south-west. also shows that before morning it changed to the westward. When it changed is shown, by the testimony of the first hand of the sloop, that when the sloop entered the Highlands, the wind blew hard enough to compel them to take in their sails. Furthermore, this same witness says, that they again made sail after they passed Magazine Point, but with a reef in the mainsail. Hoisting a reefed mainsail within a short distance from the place of collision, clearly shows that there' was plenty of wind at the time of the collision. So also the master of the sloop is proved to have stated, in accounting for the collision, that his sloop would not luff, and he himself admits the repeated use of that expression, which implies the presence of wind. A sailor would not have used such an expression to excuse the action of his vessel, unless there had been a wind.

In addition to these facts, derived from the evidence of the libellants, there is the testimony of the pilot of the ferry-boat at Garrison's, a witness wholly unconnected with the controversy, who was at his house at Garrison's, and was awakened in the night by his wife because his window had broken loose. and. getting up to make it fast, found the wind blowing heavily; likewise the testimony of the pilot ·of the Thos. Powell. a witness equally free from connection with these parties. who landed at Cold Spring about 11 p. m.. and recollects having to stop for a small boat under sail, and who says the wind at that time blew heavily. In view of such a mass of testimony it is impossible to believe the statements of the crew of the sloop, when they say there was no wind. On the contrary, it must be held that the sloop had a good working breeze. This fact in regard to the wind, being found against the libellant, is conclusive of the case. With a wind which would enable the sloop to keep her proper course, she is found at the time of the collision well over to the east side of the river, and presenting her starboard side broadly to a vessel bound up. Such a course on the part of a sailing vessel at West Point. in a fresh breeze from the north-west. cannot be justified. Not that the sloop was bound to change her course to avoid the propeller. but because she was bound in passing that point to keep her

place in the river, if possible, and not to permit herself to be carried over to the east side, in the track of a steamboat which was pursuing the ordinary and only safe course to pass that point. Whether this action of the sloop arose from ignorance, or from carelessness, or from some defect in her rigging, which made her refuse to obey her helm, is immaterial, so far as the liability of the propeller is concerned. The propeller is not responsible for the improper position of the sloop.

There remains to consider whether the propeller was guilty of negligence in omitting any effort within her power to avoid the sloop; for, notwithstanding she had the right to suppose that in such a breeze the sloop would not attempt to go over to the east side, and to take her course accordingly, still, when she saw that the sloop was going over to east, it was her duty to avoid her if she could do so. It has accordingly been most earnestly contended that the propeller must be held in fault, upon her own answer, for sheering to the east instead of to the west, after she saw that the sloop was going over to east.

The zeal with which this feature of the case has been pressed, by an advocate of such large experience in matters of this kind, has led me to weigh with all possible care the evidence in the case bearing upon this point in connection with the answer; but I am constrained to say that I cannot agree to the conclusion which the libellant seeks to draw. The answer, indeed, says that after the sloop got around the point, she exhibited her port light and immediately shut it in again, and the pilot of the Hasbrouck then gave a slight sheer to east, then blew one blast of his whistle, and then stopped his boat. But if it be true that this sloop, with a working breeze, approached the point showing her starboard light, and, when below the point, showed her port light to the propeller, then coming up to east of her, and then shut out the port light, all which is proved, it would not follow that the propeller was bound to sheer to west, unless it also appear that there was room to do it after the red light shut off. Up to that time, the propeller was well justified in supposing, and indeed bound to suppose, that the sloop was intending to pass down to west. The statement of the pilot of the propeller is that there was not room to sheer to west after the port light shut off, and this statement is entirely consistent with the answer, and it is also supported by other evidence. which appears to me to be entirely controlling. Doubtless, some of the estimates of distance given by the pilot would indicate that he had more room; but estimates of distance can never be relied on in this class of cases, and they should not control his positive declaration that when the sloop, by shutting in her port light, indicated that she was going to the east, there was neither time nor room to en-able him to avoid her by sheering to west. This statement of the pilot derives confirmation from the evidence of the first hand of the sloop, who says that when the propeller sheered to east she was very close to the sloop. To the same effect is the testimony of Dolahan, also a witness of the libellant, who says the propeller was pretty nigh on the sloop when she sheered to east. The proximity of the vessels is clearly and indisputably shown by the testimony of Decker, the watch on the barge Ulster County, which was being towed up alongside of the Hasbrouck, a witness wholly unconnected with the navigation of the propeller. This witness was standing midships on the barge when he heard the whistle of the propeller. which was blown when the red light shut off. He at once started forward, and when he reached the slide, some twenty feet from where he stood, and looked out, the sloop was close at hand, within a length or a length and a half of the propeller. The testimony of Bullis, who was below on the Ulster County, also indicates the short space of time between the whistle and the blow; and, finally, the libel gives the distance of the vessels apart at this time as about 50 feet. It is, therefore, impossible to hold the propeller in fault for omitting to sheer to port or for omitting to stop and back in time. So long as the sloop was to west of her and showing a red light the propeller was not called on to do either. When the red light was shut off she was too near the sloop to do anything more than she did. My conclusion, therefore, is that the collision in question was not caused by any fault on the part of the propeller, and, accordingly, the libel must be dismissed with costs to be taxed.