## THE IRON CHIEF.

## THE J. F. CARD.

### (District Court, E. D. Michigan. October 17, 1892.)

1. COLLISION BETWEEN STEAM AND SAIL — NARROW CHANNEL — FAILURE OF SAILING VESSEL TO HOLD HER COURSE.

A schooner bound down the lakes, with a fresh northwest wind, having failed to obtain a tug to take her into the St. Mary's river, tacked across the broad southern channel, and entered the narrow northern one, rarely used by sailing vessels. A steamer with a barge in tow was at the same time passing up this channel on a course about N. W. The steamer, supposing the schooner was beating up the lake, stopped to let her pass the mouth of the channel, but, when she put her helm up to enter it, started ahead, taking the northern side, in order to pass port to port. The schooner lost her swing, put her helm down, and collided with the steamer and the barge. *Held,* that the collision was the fault of the schooner, whether caused by her putting her helm down, by previous improper handling, or by failure to obey her port wheel, and that her failure to hold her course excused the steamer from the duty of keeping out of her way.

2. SAME — NEGLIGENCE IN NEEDLESSLY ENTERING A NARROW CHANNEL.

The schooner was in fault in needlessly taking the narrow northern channel after the steamer had entered it. She should have awaited the steamer's exit, or taken the broad channel.

3. SAME — PROPRIETY OF GOING AHEAD AT FULL SPEED TO AVOID COLLISION.

When the schooner lost her swing, it was proper for the steamer to go ahead at full speed, — the only possible way of avoiding the collision.

In Admiralty. Libel against the steamer Iron Chief for collision with the schooner J. F. Card. Dismissed.

H. C. Wisner, for libelant.

Shaw & Wright and H. D. Goulder, for the Iron Chief.

SWAN, District Judge. About 9 o'clock A. M. of July 24, 1891, the weather being clear and the wind fresh from the northwest, the schooner J. F. Card, bound down, came into collision with the steamer Iron Chief, having in tow the barge Iron Cliff, both coal laden and bound to Duluth. The collision occurred a short distance above Round Island, at the head of St. Mary's river, and at its junction with Waiska bay, and on the extreme northerly side of the channel leading between "Middle Ground Buoy," No. 76, (red spar buoy,) and "Opposite Middle Ground Buoy," No. 79, (black spar buoy,) as these are designated and located in the United States official "List of Beacons, Buoys, and Stakes." Buoy No. 76 marks the north side of the channel, and is 250 feet N. N. W. of Opposite Middle Ground Buoy No. 79, which is on the south side of the channel. The course up this channel is N. W. by W. 1·2 W. This is sometimes styled the "Steamboat Channel," because steamboats almost invariably pursue it. About half a mile S. by E. of black spar buoy No. 79 stands Waiska bay buoy, a third-class can buoy, painted red, and marking the north side of a safe and much wider channel than the first, with a depth of 16 feet. With this channel the master of the schooner was not unfamiliar. The J. F. Card was 137 feet long and 25 feet beam. She was laden with a cargo of block stone,

mostly in the hold, and had sailed down from Portage Entry. Passing Point Iroquois five miles to the northward and westward of the place of collision, under foresail, mainsail, and three jibs, she stood in towards the Mission, about two miles to the southward of Point Iroquois, looking for a tug to tow her into the St. Mary. Failing in this quest at the Mission, she came about, and tacked across the bay, and then stood back to Point Extreme, two miles southward and eastward of the Mission. She again came about, and ran on a northeasterly course for the buoys between which the collision occurred. In making these stretches the Card passed at least three times the entrance to the southerly passage marked on the north side by Waiska bay can buoy, into and through which channel she would have carried a fair wind. When first seen by the watch of the Iron Chief, the schooner was to the southward and westward of Waiska bay can buoy, on her tack from Point Extreme, and 2 1-2 or 3 miles away. The steamer was observed by the crew of the schooner about the same time. When the Iron Chief had made the turn below the buoys, and straightened on her course of N. W. by W. 1-2 W. to pass between them, and was distant from them about a quarter of a mile, the schooner was somewhat nearer, and to the westward and southward of, the black stake, (buoy No. 79.) When about 800 feet from the stake, the schooner took in her mainsail, and put her helm up, to run down between the buoys. The master of the steamer, who was called as a witness by the libelant, testifies that up to this time he thought the schooner was bound up the lake, and had either been at anchor in Waiska bay, or a tug had let go of her there, and she was working out. This impression was confirmed, to his mind, by the fact that, though she had the wind free to enter the river, she was beating across the bay, apparently by the wind, and had crossed the entrance to the southerly channel, and by the further fact that sailing vessels rarely run the northerly channel without the aid of a tug. Acting on this belief, Capt. Dennis, the master of the Iron Chief, before the schooner settled her mainsail, checked and almost immediately stopped the steamer, "intending," as he states, "to let this vessel either go across the channel, or come in stays. I didn't know then whether she was working out the bay or not. * * * I supposed, up to this time, he was working out of the bay." He further said that before then the schooner was not standing over in a proper way to enter the channel, her position being too far to the southward of the buoys to indicate that purpose. The steamer, when thus stopped, was a little to the northward of mid-channel. When the schooner lowered her mainsail, and began paying off and heading down the channel, the steamer's engine was started ahead; one long blast of her whistle was sounded to notify the schooner that her course was understood, and that it was the steamer's intention to take the starboard side of the channel; and the steamer's wheel was ported accordingly. The Card then had her helm hard up, and was swinging to come down the channel. She came around three or four points, but, as her master states, lost her swing before she had got abreast of the red stake,

and, heading across the channel at an angle of four points, approached the steamer, which was hugging the north side of the channel to aid the purpose of the schooner to pass port to port. The steamer's and some of the schooner's crew testified that after the schooner ceased to swing, and was thus heading onto the steamer, the master of the latter hailed the schooner to starboard her wheel, and that this was done to ease the contact of the vessels. Capt. Dennis and the watch of the Iron Chief deny that this hail was given, but say that the supposed order was merely an inquiry if the schooner's wheel was starboard, to which no reply was made, whereon Capt. Dennis asked how the schooner's wheel was, and this was answered, "Starboard." In this conflict of statements, were it material, the probabilities favor the story of the steamer's crew, who could better hear what Dennis said; but we are saved the necessity of deciding this question of credibility by the admission of the master of the schooner that he put his helm down, "not because he [Dennis] told me to, but because I saw the collision was inevitable." Whatever prompted that change, when the schooner was about midchannel, her helm was put down, and her jib halyards let go, to let her luff up into the wind. She failed to do this in season to avert the collision, and her jib boom struck the port side of the steamer just aft of the mizzen rigging. This slewed her around somewhat, and she drifted down before the wind until she collided with the Iron Cliff, some 600 feet astern of the steamer. The Iron Cliff about the same time grounded on the north bank of the passage. This second collision damaged the bow of the schooner, knocked her anchor overboard; the chain running out until the anchor took the ground, and brought her up. The channel at the place of the collision is about 600 feet wide. The libelant practically conceded at the hearing that, if any error was committed by the steamer in attempting to pass to windward of the schooner, it was venial, under the circumstances upon which her master acted in laying her course. The faults insisted upon are the steamer's attempt to run the channel with her consort after being apprised of the schooner's purpose to sail through it, and, second, that she failed to keep out of the schooner's way. The countercharges against the schooner are more numerous. (1) Change of course. (2) Entering the channel after the steamer, embarrassed with a tow, had irrevocably laid her course through it, when the schooner might with safety have taken the southerly channel. (3) In failing to keep off and pass on the port hand of the steamer, as she had undertaken to do, and might have done, if she had been navigated with due care and skill.

There is no ground for the charge that the steamer was negligent in going ahead after the schooner indicated her purpose to enter the channel. At that time it was too late for the steamer, incumbered as she was, to recede. She had passed the entrance to the southerly channel, and the only alternatives presented to her were to keep on her course with caution, or to stop until the schooner had passed down. She was prudently stopped until the vessel's course was determined. When that was learned, no rule of law or prudence re-

quired the steamer to hold her position in the channel until the Card had passed. There is ample room between the buoys for vessels to pass each other in safety, if navigated with ordinary care and skill. There was nothing in the situation to make the passage hazardous or difficult. The schooner had the wind free and fresh, and there were no baffling cross currents to embarrass her. Her witnesses testify that she was handled and steered well. There are many narrower channels in the St. Mary's and St. Clair rivers in which vessels, steam and sail, daily meet and pass each other under conditions much less favorable. In the St. Clair Flats canal, which is less than half the width of this passage, every 24 hours, in the daytime and at night, more than 100 steam and sail vessels pass up and down, yet in the 20 years of its existence it has witnessed but one or two serious collisions. This disaster must be referred to some other cause than the narrowness of the channel.

The charge that the steamer failed to keep out of the way of the schooner is scarcely consistent with the admission that the steamer's porting was a pardonable error of judgment, rather than a fault requiring her condemnation. While the law requires a steam vessel meeting a sailing vessel to keep out of the latter's way, it is equally positive that the sailing vessel shall hold her course. The obligation of the steam vessel to perform its duty under this rule is not absolute and unqualified, but dependent upon the adherence of the sailing vessel to her course. Were it otherwise, the occurrence of the collision would be decisive of the liability of the steamer. The libel alleges "that said schooner kept her proper course, and entered said channel nearest the upper buoy, leaving plenty of room for said steamer and her consort to pass to leeward, and where the master of said schooner expected said steamer to pass him." The proofs do not bear out this allegation. The master of the Card testified that, when he put his helm up, he intended to pass the steamer to port, if he could; that he put the helm up, intending to make his vessel swing all she would; and that, regardless of the manner in which the steamer passed him, he was going to make the swing as quick as the helm and the slacked foresheet would allow,—adding: "I didn't put the helm up purposely, with the understanding I would pass him to port." He further says: "If the Iron Chief had not been there, I would have gone down in the middle of the channel, all right." His protest, made the day after the collision, also contradicts the theory of the libel. It states:

"* * * And when the Iron Chief was passing up through the buoys, near the Middle Ground, we were on our course, standing off to make the said channel. Wind northerly, air clear, foresail and three jibs set. Were sailing to pass the Iron Chief to port; and, when about two lengths away, the captain of the Iron Chief sang out, 'Put your helm hard down,' which we did, and endeavored to pass the Iron Chief. But the Iron Chief ran into us, carrying away our forward works, and causing us to leak badly. * * *"

It is clear from these proofs that the master of the Iron Chief correctly divined the intended course of the schooner down the channel, and his judgment was confirmed as the vessels neared each

other until the schooner stopped swinging before she reached mid-channel, and was heading onto the steamer at an angle of about four points. The steamer was then as far to the northerly side of the channel as she could safely go. It is claimed that she should have been stopped. Stopping would only have precipitated the collision, which had then become inevitable, unless the schooner payed off. In that situation the steamer was not bound to stop. The only possibility of averting the collision lay in her going ahead at full speed. The J. L. Hasbrouck, 4 Ben. 359, 93 U. S. 405; The Nereus, 3 Ben. 238; The Virgo, 7 Ben. 495; The Blue Jacket, 144 U. S. 391, 12 Sup. Ct. Rep. 711.

In this crisis the helm of the schooner was put down. Some of her crew testify that the collision occurred before the schooner felt the starboard wheel. The claimant's witnesses and some of the schooner's crew assert the contrary, and say, if she had not come up at all, she would have gone under the steamer's stern. However that may be, it is plain that, if the change was made in extremis, it was not made necessary by the fault of the steamer, but was occasioned either by the failure of the schooner to obey her hard port wheel, or because it was shifted. Echols, who was at the wheel of the schooner, says that—

"The schooner would have gone down about mid-channel, if we had kept on swinging, and I expected to go down that way. * * * I got an order from the captain to put the helm down. * * * Our vessel was going off all right, and under perfect control, until that order. After I put the helm down, I first thought there was going to be trouble."

O'Flynn, another seaman of the schooner, testified that—

"When the order, 'hard up,' was given, I suppose we would go down the channel. I expected to leave the steamer on our port hand. Aside from the order to put the helm hard down. there was nothing to prevent the steamer swinging, and going down the ordinary way. * * * Starboarding our helm stopped our vessel's swing. * * * When our helm was put up, and the schooner paid off, I didn't think there would be a collision, but feared it when she stopped swinging."

Newell, the mate of the schooner, says:

"When our helm was put up, I had no apprehension of having a collision."

It seems clear from this testimony that, had the schooner kept her helm up, the vessel would have passed without difficulty. Whether or not, under the starboard wheel, the Card came up into the wind appreciably, is immaterial. She ceased to pay off as she had been doing, and that effect alone of the starboard wheel was a change of course. The proofs are convincing that a vessel of her class, with the wind as it was, would easily swing three points in twice her length; and she had more than six lengths to make a safe course past the tow, if properly handled. The weight of the evidence is that her foresail was not properly run off. Had this been done, it would have facilitated her swinging. If she were a good-handling vessel, and steered like a yacht, as is claimed for her, she ought to have had no difficulty in making her course good. If her failure is chargeable to any

infirmity of the vessel, it is manifest that libelant is not entitled to redress from the steamer for its consequences. If she could have gone down "none to northward of mid-channel," if the Iron Cliff had not been there, as her master claims, no reason is perceived why the same course was not possible to her as the steamer was·close to the northerly buoy. Whether the collision is chargeable to her change of course, improper handling, or the inability of the schooner to make the course she attempted, the result acquits the steamer.

The schooner was also blamable for needlessly taking a course which invited risk of collision. While the abstract right of a vessel to pursue any navigable channel in the course of her voyage is undeniable, the adoption of a course which was to some extent obstructed by a tow of heavily-laden vessels, when a free and wellknown channel is open and near at hand, is censurable, and should of itself, if the proofs were nicely balanced, resolve any doubt as to the care and skill of her master against the propriety of her navigation. Her master says that he could have safely have held his course of N. E. by E. for half a mile before taking in his mainsail. If determined to sail down the channel between the buoys, he ought to have waited the exit of the steamer and her tow from the passage before entering it, or the schooner could have been held in stays meanwhile; for in two or three minutes the Iron Chief and her consort would have cleared the buoys. In The City of Hartford, 7 Ben. 354, the sailing vessel was condemned for a collision, in a case much like the present, because, having another channel open to her, she elected to take the chance of passing in narrow water a steamer which had, like the Iron Chief, but one channel she could take.

The collision was not caused by any fault of the Iron Chief, and the libel must be dismissed, with costs.