## RODI v. DEAN.

### No. 8212.

Circuit Court of Appeals, Seventh Circuit.

Oct. 27, 1943.

Edward B. Hayes and Robert Branand, Jr., both of Chicago, Ill., for appellant.

Wellington G. Brown, of Chicago, Ill., and Charles W. Gore, of Benton Harbor, Mich., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

By this action in admiralty appellee sought to recover damages from the yacht Lady Lu, and its owner the appellant, for injuries alleged to have been suffered by appellee's cruiser Harolmi III, by reason of a collision of the two vessels. Appellant filed a cross libel to recover damages

suffered by the Lady Lu in the same collision. The District Court found the facts specially, entered its conclusions of law thereon, rendered its decree in favor of libelant against cross-libelant, and dismissed the cross libel. From that decree this appeal is prosecuted.

It is admitted that cross-libelant Rodi was the owner of the Lady Lu, and was not on the boat at the time of the collision, but that it was in charge of his operator and agent, Stanke. It is further admitted that the Harolmi III was owned by appellee Dean, who at all times here involved was operating it.

The collision occurred shortly after ten o'clock on the evening of July 28, 1941. There is no controversy as to many of the facts, but the parties differ widely as to the relative position of both vessels, and as to the course of each vessel up to the time of the collision. There is substantial evidence supporting the following facts favorable to appellee.

Dean was at the wheel of his cruiser Harolmi III, and was navigating her in an easterly direction toward the harbor of the city of Saint Joseph, Michigan, in the navigable waters of Lake Michigan, on a course directed from a point about one mile west of the north pier of that harbor, on the range lights of the north pier of the harbor, at a rate of about ten miles per hour. At that time the Lady Lu was coming west on the starboard side of the Harolmi III on a course about 75 feet or 100 feet south of and parallel to the course of the Harolmi III. The relative positions of the two vessels at that time were such that only the green starboard and white bow and aft lights of the Lady Lu were observable to the occupants of the Harolmi III. Her red port light was lit but it was not observable to the occupants of the cruiser. The Harolmi III continued her course and speed, and as the vessels approached, the Harolmi III gave two loud blasts of her horn as a signal for a starboard to starboard passage, which signal was not answered or heard by any occupants of the Lady Lu. There was ample room for both vessels to pass starboard to starboard without danger of collision, and the Lady Lu continued on her course as did the cruiser. As the Lady Lu approached she was kept under observation by libelant Dean, and when the Lady Lu was about 30 feet east and 75 feet or 100 feet south of the Harolmi III, the Lady Lu suddenly and without any warning sheered to the

north and collided with the Harolmi III, striking the latter on her starboard side somewhat aft her beam, thereby causing the damages complained of. At no time did the Lady Lu blow her horn or whistle or give any signal.

Cross libelant's contention, which is supported by evidence, is that the Lady Lu was going west on a course *north* of and parallel to the course of the Harolmi III, with ample room for both vessels to pass safely port to port, had each continued on its course; that when the Harolmi III was about two boat lengths west of the Lady Lu she suddenly and negligently changed her course, by turning to her port, and cutting across the bow of the Lady Lu, thereby causing the collision, without contributing negligence on the part of the Lady Lu.

A study of all the evidence convinces us that it preponderates in favor of appellee both as to the position and course of the Harolmi III. That is to say, at all times here in controversy, up to the time of the collision, she was north of the Lady Lu, and was pursuing an easterly course parallel to that of the Lady Lu, until the latter changed her course to starboard shortly before the collision. We think it cannot be doubted that the Harolmi III was traveling on the range lights of the north pier of the harbor, and this being true she could not have been pursuing a course south of and parallel to that of the Lady Lu, nor was she attempting to make a port to port passage.

Moreover, it is undenied that the Lady Lu's red port light was lit and that none of the testifying occupants of the Harolmi III saw it, although they looked, and saw all other required lights of the Lady Lu forward, aft, and starboard. We think the only reasonable inference to be drawn from this fact is that the Harolmi III, at all times material to the questions here involved, was north of the Lady Lu. Our conclusion in respect to the positions and courses of the two vessels is supported by the greater number of witnesses. While we recognize the rule that a preponderance does not necessarily mean the greater number of witnesses, yet that fact should not be ignored where, as here, no witness of either litigant is impeached except by conflicting testimony of witnesses of the other litigant with respect to factual observations, or perhaps by the friendly interest, if any, such witness might have in

the success of the litigant in whose behalf he testified.

Furthermore, a disinterested witness, one Selfridge, testified that on the evening of the collision, just before it occurred, he was operating his own cabin cruiser out between the piers at St. Joseph, Michigan, in the harbor above referred to, about a mile and a half or two miles west of the piers. On his way out he observed a boat which was going toward the piers. The two vessels passed starboard to starboard, and the green starboard light of each was lit. At about a mile and a half or two miles from the piers he turned his boat around to port and shut off the engines. There was no boat south of him and he observed no boats on the lake other than the one he had passed going toward the piers. He heard a crash and repeated blasts of a whistle and noticed rockets being sent up towards shore. He thereupon went to the place of the collision where he saw a boat that he had not seen before, with the bow of another boat sticking out of the water in front of it. The boat that was afloat was the Lady Lu. The significant part of this testimony is that after Selfridge had passed the incoming boat, starboard to starboard, which unquestionably was the Harolmi III, he made a complete turn to the left and faced the pier. Under these circumstances his vessel was at all times south of the Harolmi III.

It is not contended by cross-libelant that there were more than three vessels in sight on the lake at the times here involved, but his contention, which is supported by some evidence, is that the Selfridge boat was north of the Harolmi III. That fact is testified to by an employee of the United States Local Inspection of the United States Coast Guard. However, we think his testimony is not so impressive because of the fact that at the same time he was observing these boats he was also making an entry in his log and scanning the lake in other directions, as was his duty, and especially was he looking for his relief man who was then about due. Owing to the distance of his position from the Selfridge vessel and the Harolmi III, and the fact that it was nighttime, he had no way of telling one boat from the other. Under these circumstances we think the coastguardman was mistaken.

In addition to what we have said, it is not denied that appellee Dean had had fifteen years experience in operating boats sim-ilar to that which he was driving at the time of the collision. On the other hand, one Nugent, a guest of appellant and a prospective purchaser of the Lady Lu, who was at her wheel just prior to the accident, said his only experience in running boats was picked up from being on boats most of the summer, and that he did not claim to be able to run a boat. On this occasion, after Captain Stanke had started the engines and put them in gear, he, Nugent, had merely taken the wheel and steered the boat, and continued to steer it until the captain grabbed the wheel about a minute before the collision. Before the collision, the captain had gone down in the galley to eat his dinner, returning shortly before the collision with some food in his hand, which he was eating while standing near Nugent at the wheel.

Furthermore, after the collision when the occupants of the Harolmi III had been transferred to the Lady Lu, libelant Dean testified to the following conversation he had with Captain Stanke of the Lady Lu:

"When I got onto the boat and we were about to pull away from our boat, he (Stanke) asked me if I would go down and see how much water his boat was taking. I went down and came back and reported that it was not taking any after it was released from my boat. My boat, at the time of sinking, held it down, but after it was released his boat came up so that it didn't take water upon navigating.

"We started to come away from the accident and in to the pier, and he says, 'My starboard motor is froze. I guess I will have to go in on one motor.' I said, 'What happened? Didn't you see me?' He says, 'I wasn't at the wheel.' I said, 'who was?' He says, 'I am not talking. It would mean my job.' There was some discussion about the starboard motor being frozen in reverse gear, and he would have some difficulty in landing at the coast guard dock, but he thought he could make it."

Stanke, who at the time of the trial was no longer in the employ of Rodi, denied this conversation with Dean. He testified that his port engine was frozen but denied that his starboard engine was.

■ If the port engine were frozen in reverse before the collision, that fact would have caused the Lady Lu to shift its forward course to port if the rudder were turned to port and the running starboard engine were in forward gear. Likewise if the starboard engine were frozen in reverse,

312

the rudder turned to starboard, and the running port engine in forward gear, that condition would have caused the Lady Lu to shift its forward course to starboard. The only significance such evidence could have would be merely in explanation of the possible cause of such turning from the forward course of the Lady Lu, if there were such a turning. However, if, as a matter of fact, the Lady Lu did change her forward course to starboard just before the collision, that fact cast no burden upon libelant to prove the cause of the change. Regardless of this particular evidence we are convinced that the Lady Lu did suddenly change her course to starboard, and that that fact was the proximate cause of the collision.

■ Appellant contends that both vessels were at fault and that the damages should be apportioned according to the admiralty practice. In support of this contention he urges that the libelant was at fault in three respects: In continuing with unabated speed after her signal for passage was not answered by the Lady Lu; in attempting to navigate at night with no designated lookout apart from the helmsman; and in not proving that the Harolmi III had a sound signal strong enough to comply with the law. If we concede negligence on the part of libelant in respect to any or all of these matters, it would not warrant an apportionment of damages in this case, for it is clear from the evidence that none of such acts, or failure to act, could be considered as a proximate cause of this collision. We think that the preponderance of the evidence shows that libelant was free from any negligence which contributed to the collision.

■■ It is further contended by appellant that libelant's damages should be limited to the market value of his vessel at the time of the accident and should not have been extended to the estimated cost of her repairs. We think the law is that where there is a total loss, the measure of damages is the market value of the vessel at the time of the destruction, if the vessel is of a class which has such value. If there is not a total loss, the measure of damages is the cost of repairs. The Granite State, 3 Wall. 310, 70 U.S. 310, 18 L.Ed. 179; The Baltimore, 8 Wall. 377, 75 U.S. 377, 19 L.Ed. 463; Alaska S. S. Co. v. Inland Navigation Co., 9 Cir., 211 F. 840. It is conceded that the Harolmi III was a pleasure boat, and from the evidence

in this case it would appear that there is little if any market for boats of this class. In such a case, market value cannot be used as a measure of damages. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; The H. F. Dimock, 1 Cir., 77 F. 226; The Benjamin A. Van Brunt, D. C., 3 F.2d 655. However, since there was not a total loss in this case, the market value has no application. Appellant's witness who testified as to market values also stated that it was his opinion that the Harolmi III was not a total loss. We think there is no merit in this contention.

The decision of the District Court is affirmed.