## BUCKEYE S. S. CO. v. UNION TOWING & WRECKING CO.
### No. 3361.

District Court, N. D. Ohio, E. D.

June 6, 1946.

Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, for libelant.

McKeehan, Merrick, Arter, Stewart & Cottrell, of Cleveland, Ohio, for respondent.

FREED, District Judge.

The libelant, owner of the Steamship Maritana and the Barge Maia, seeks recovery for damages sustained in a collision between the barge and the steamer in the harbor of Superior, Wisconsin, on May 31, 1942.

The respondent is the owner of the Tugs Massachusetts and Missouri, which had the Maia in tow at the time of the collision.

Both the barge and the steamer had loaded cargoes of iron ore at Great Northern Dock No. 4, and were preparing to leave the harbor, intending that the Maritana was to tow the Maia to lower lake ports.

The Maritana is a bulk freighter, 320 feet in length, and the Maia, which is 376 feet long, is a barge without motive power of her own.

The two tugs had been called to assist the barge in leaving the dock, to turn her about and to help hook her to the Maritana so that she could begin the voyage.

As they lay aside the dock, about an hour before the collision, the barge and steamer were headed into the slip, port side to on the west side of the dock, with the steamer astern of the barge.

It was a cloudy afternoon, but visibility was clear and there was nothing to obstruct the vision of the vessels during the entire period covering the events here in question. A fresh northwest wind was blowing at the time and a 3-to-4-mile-an-hour current was setting in from the lake, running between the piers into the harbor basin, in the direction of the Great Northern docks.

The Maritana backed away from the dock shortly after the tugs arrived, headed up the basin under steerageway, and turned. She then proceeded slowly down the basin until she was approximately abreast of the Government dock, out in the center of the basin channel, awaiting the winding of the Maia. At that point she cut her engine and lay waiting for the tugs to bring the Maia out of the slip.

The Barge Maia, with the Missouri at her stern and the Massachusetts at her bow, was being pushed and pulled out of the slip. As the Maia's bow cleared the end of the dock, the Massachusetts swung under her bow and off to the port and began pulling her about. At the same time the Missouri was working off the stern of the Maia, the effect of the combined action of both tugs being to pivot the barge in order to head her about toward the opening in the piers in line with the channel leading to the lake.

As the winding operation began, just after the bow of the Maia had cleared the end of the dock, the Maritana got under way again, proceeding down the basin, headed on No. 1 light.

There is no serious dispute as to these events immediately preceding the critical operations which resulted in the collision. However, every salient fact thereafter is in sharp conflict and there are innumerable contradictions in the testimony of the witnesses.

From this irreconcilable divergence in the proof, the court ultimately must determine what actually transpired to resolve the question of liability.

The testimony, in the judgment of the court, has established the following controlling facts.

Those in charge of the navigation of the Maritana knew she would have to wait until the winding operation had been completed before she moved into position to effectuate the hook-up with the Maia, and they knew how and where the winding operation would have to take place.

Capt. Butler, in command of the Maritana, ordered his vessel to be put under way at a time when he knew there was a current running through the piers across the basin and while the winding operation was still in progress.

The Maritana proceeded slowly down the basin in the center of the channel, headed on No. 1 light, until she came to the place where the piers opened up. She was under control until she reached the opening in the piers, at which time she began to feel the full effect of the current. Her captain ordered a hard left on the wheel in order to make the turn into the channel, but the vessel failed to respond to her rudder.

As soon as Capt. Butler determined she was still out of control, he ordered slow speed ahead, the wheel remaining at hard left. The vessel, nevertheless, did not respond. He then ordered half speed ahead, and, when again she did not respond, he ordered full speed ahead. The Maritana

maintained her headway during these operations and was approaching on No. 1 light, still out of control.

At no time during these operations did Capt. Butler doubt that he would be able to regain control of the Maritana, and he did not believe there was any danger of collision with the Maia or the tugs which had her in tow.

The proof shows that when Capt. Butler feared that as the result of the Maritana's headway she might "plow" into No. 1 light, he ordered full speed astern and before the vessel checked her headway, she had reached a point approximately 200 feet from the harbor light.

The action of the propellor, with the wheel hard left, resulted in carrying the vessel slowly astern with her bow swinging in an arc to the starboard in the direction of the tugs and their tow.

The Massachusetts and the Missouri, at the time when the order for full speed astern was given by Capt. Butler, had succeeded in winding the Maia about, so that the barge was headed into the current and was almost motionless. In this position, the Maritana was bearing down on the Maia under the impulsion of the strong current.

The Maia and the Maritana were approximately 400 feet apart at this moment, when Capt. Butler first became aware of the danger of a collision. At about the same moment, Capt. Nolan, in charge of the Massachusetts, likewise saw the Maritana bearing down on the barge and similarly realized the danger impending. Both vessels sounded signals almost simultaneously.

Until that moment Capt. Nolan had no reason to believe there was any danger, nor had he had cause to maneuver his vessel in any manner different than he had. As the Maritana bore down on the Maia, Capt. Nolan came in along the port aside of his tow and worked astern as hard as he could in an effort to extricate the barge.

He did everything a prudent seaman, under like circumstances might have done, to avoid the collision which was then imminent when he first had reason to apprehend the danger. It was a matter of moments between the time when Capt. Butler first

realized his vessel was out of control and the time of the collision.

The two vessels collided, the bow of the Maia coming into collision with the starboard side of the Maritana at about right angles.

It is urged by the libelant that the collision was due to the sole fault of the Massachusetts in that she failed to maintain a proper lookout and further, that the Tugs Massachusetts and Missouri did not take steps seasonably to avoid the collision.

The respondent claims the collision was the result of the sole negligence of those in charge of the navigation of the Maritana.

█ The burden rests with the libelant, in order to permit a recovery, to establish that the absence of a lookout on the Massachusetts caused or contributed to the collision, or that when the collision was impending, those in charge of the winding operations of the Maia did not take timely steps to avoid it.

There is no conflict between the litigants that apart from Capt. Nolan there was no lookout stationed on board the Massachusetts. The dispute, however, as to the absolute necessity for stationing a lookout in addition to Capt. Nolan, is most vigorous.

The extent of the obligation imposed by judicial interpretation of the duty to maintain a lookout is forcibly demonstrated in the language of Mr. Justice Swayne in The Ariadne, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542: "Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary." Genesee Chief v. Fitzhugh, 12 How. 443, 53 U.S. 443, 13 L.Ed. 1058; The Ottowa, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165; The Northern Indiana, D.C., Fed.Cas.No.10,320; The John Fretter, C.C.Mich., Fed.Cas.No.7,342; The Young American, D.C., Fed.Cas.No. 18,179 and The Miranda, D.C., Fed.Cas. No. 4,977.

The navigation rule, 33 U.S.C.A. § 293, applicable to the Great Lakes, enacted in 1895, provides: "Nothing in these rules

shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout * * *."

Other decided cases to date have adopted the language found in The Ariadne, supra, as defining the duty cast upon the vessel which does not have a proper lookout. British Columbia Mills T. & B. Co. v. Myrolie, 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807; Rodi v. Dean, 7 Cir., 138 F.2d 309; Delaware L. & W. R. Co. v. Central R. Co., 2 Cir., 238 .F. 560; The No. 1004, 2 Cir., 29 F.2d 203; Dahlmer v. Bay State Dredging & Cont. Co., 1 Cir., 26 F.2d 603; Great Lakes Towing Co. v. Masaba S. S. Co., 6 Cir., 237 F. 577, and Olsen v. New York Central No. 18, 2 Cir., 120 F.2d 287.

█ However, it is apparent to this court from the adjudicated cases that since the purpose of a lookout is to watch and advise those in charge of the navigation of the ship of what is in the way of the ship, (Columbia Mills T. & B. Co. v. Myrolie, supra) the mandate of maintaining a physical lookout is not absolute when the collision could not have been guarded against by the presence of a lookout. The Blue Jacket, 144 U.S. 371, 12 S.Ct. 711, 36 L.Ed. 469; The Victory & The Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; Lake Erie Transportation Co. v. Gilchrist Transportation Co., 6 Cir., 142 F. 89; The Livingstone, 2 Cir., 113 F. 879; The George Murray, D.C., 22 F. 117; The Badger State, C.C.Ill., 15 F. 346; The Chicago, D.C., 71 F. 537; and the Maria Martin, C.C.Wis., Fed.Cas.No.9,079.

In this circuit, Judge Denison, in Great Lakes S. S. Co. v. Pittsburgh S. S. Co., 6 Cir., 222 F. 862, at page 866, states the law as follows: "We think it should be assumed that the absence of the lookout would be a condemnatory fault, unless it satisfactorily and clearly appears that his presence would have made no difference (The Ariadne, 13 Wall. 475, 20 L.Ed. 542; The Roby, 6 Cir., 111 F. 601, 612, 49 C.C.A. 481); but we are unable to see any reasonable ground for thinking that the absence of the lookout could have been material."

Accepting the interpretation of the rule exactly as stressed by the libelant, that invariably the vessel failing to maintain a lookout has the burden of showing that the presence of one could not have guarded against the collision, what does the factual situation demonstrate in this case?

The captain of the Maritana did not perceive any danger until she was approximately 400 feet from the Maia. On board his own vessel, he did not doubt that he could keep the Maritana under control and he was not apprehensive of any danger until after he ordered full speed astern. It was then, for the first time, that he realized his vessel would not respond to her rudder and head into the channel. When the danger of collision was first discernible to both vessels the signals were sounded.

█ Had there been a lookout present on the bow of the Massachusetts, he would not have been able any sooner to realize the Maritana was helpless to avoid a collision with the Maia. Capt. Butler, himself, did not know it prior to that time. The lookout, had there been one on the tug, would have assumed, under the well-recognized rules of navigation, that the burdened vessel would and could stay clear of the privileged tug and tow.

█ In the court's judgment, the proof is conclusive that Capt. Nolan, at the time when a lookout might have given him information as to the possibility of a collision, himself noted the predicament of the vessels in question, and that he had all the information which any lookout, had there been one, could have furnished.

It is the finding of the court, therefore, that the proof has demonstrated clearly that the presence of a lookout aboard the Massachusetts would not have availed to avert the collision.

The conclusion which the court has reached with reference to the imminency of the collision when the danger of it first become discernible, and the judgment that Capt. Nolan did what any prudent seaman might have done in a like exigency, disposes of the charge of fault against the Massachusetts for failure to take timely steps to avoid the collision when it impended.

The Maritana, having failed to establish fault on the part of the Massachusetts which contributed to or caused the collision and which would permit recovery, the necessity to discuss any fault or negligence of the Maritana is precluded.

Whether the collision was caused by the fault of the Maritana, was the result of unavoidable accident or vis major, would in no respect change the conclusion reached.

The libel must be dismissed.