Petition of Alfred LANDI, Edward Mainieri and Mildred Mainieri, as Co-Owners of the Chris-Craft Sedan Cruiser Yacht, THE ESCAPE II, for exoneration from or limitation of liability.

Alfred LANDI, Edward Mainieri and Mildred Mainieri, as Co-Owners of the Chris-Craft Sedan Cruiser Yacht THE ESCAPE II, Libellants,

v.

THE S.S. M. J. DERBY II, Diesel Tanker M. J. Derby, Inc., Claimant.

United States District Court
S. D. New York.
June 23, 1960.

Bigham, Englar, Jones & Houston, New York City, for petitioners-libellants Alfred Landi, Edward Mainieri and Mildred Mainieri; Charles A. Van Hagen, Jr., and Donald M. Waesche, Jr., New York City, of counsel.

Foley & Martin, New York City, for claimant S.S. M. J. Derby II and Diesel Tanker M. J. Derby, Inc.; John H. Hanrahan, Jr., New York City, of counsel.

Cooper, Ostrin & DeVarco, New York City, for claimants Anne and Milton Peshkin, E. Schwartz and A. Karff, Ex'r of Ruth Yurgrau, Deceased; Richard Gyory, New York City, of counsel.

William Fried, New York City, for claimant Alfred Rutledge Nettles, Adm'r of Estate of Ruth Cochran Nettles, Deceased; Jacquin Frank, New York City, of counsel.

LEVET, District Judge.

These two proceedings are the result of a collision between the Chris-Craft Cruiser Escape II (hereinafter called the Escape) and the Coastwise Tanker M. J. Derby II (hereinafter called the Derby) which occurred in the East River between the Manhattan shore and the southern end of Blackwell's Island (Welfare Island) on May 20, 1956.

The first proceeding is that instituted by the owners of the yacht by petition, praying for a decree for exoneration from or limitation of liability arising out of the collision pursuant to Sections 183 to 189 of Title 46 United States Code Annotated.

The second proceeding is the action instituted by a libel in admiralty by the owners of the yacht against the tanker Derby, in rem, to recover for the damage to the yacht Escape.

The two proceedings were consolidated for purposes of trial.

356

Having examined the pleadings, briefs, proposed findings of fact and conclusions of law of the parties and having heard the testimony and other proof of the parties, I hereby make the following Findings of Fact and Conclusions of Law:

## Findings of Fact

1. On May 20, 1956, petitioners-libellants, Mildred Mainieri and Alfred Landi, together with Edward Mainieri, were co-owners of the Chris-Craft cabin cruiser Escape.

2. By stipulation of all of the proctors for the parties hereto, Edward Mainieri, now deceased, was dropped from these proceedings both as a party petitioner in the limitation of liability proceeding and as a party libellant in the libel filed against the Derby. (The exact effect of this is not here determined.)

3. By stipulation of all of the proctors for the parties hereto, the libel filed herein was amended to bring in the Fireman's Insurance Company of Newark, New Jersey as a party libellant.

4. Libellant, Fireman's Insurance Company of Newark, New Jersey, is a corporation organized and existing under and by virtue of the laws of the State of New Jersey, with an office and place of business at 123 William Street, New York, N. Y. Prior to May 20, 1956, said insurance company had issued a policy of hull insurance covering the Escape and by reason of the payments made to its assured arising out of this collision has become subrogated to the rights of the assured to the extent of its payment.

5. Claimant, Diesel Tanker M. J. Derby, Inc., is a corporation organized and existing under and by virtue of the laws of the State of New York, and on May 20, 1956 was the owner of the tanker Derby.

6. The Escape is a wooden hulled Chris-Craft cabin cruiser, 33 feet long, with a 10 foot beam, powered by two 105 h. p. engines. On May 20, 1956 all of her engines, steering gear and navigational equipment were working prop-

erly and the vessel was in all respects seaworthy.

7. The Derby is a steel hulled tanker, 180 feet long with a pilot house located 131 feet 5 inches aft of the bow.

8. On May 20, 1956, Anne Peshkin, Milton Peshkin, Ruth Yurgrau, Ruth Johnson, Ruth Nettles and Alfred Landi boarded the Escape at the 79th Street Yacht Basin, located at 79th Street and the Hudson River. The Escape proceeded north in the Hudson River, thence into the Harlem River and then headed south in the East River. It was a sunny, clear day with little wind and excellent visibility. The tide in the East River was setting to the north and between Blackwell's Island and the Manhattan shore was flowing at a speed of approximately 4 knots.

9. The Escape proceeded southerly in the East River maintaining a course parallel to the banks of the river in about midstream. Alfred Landi was at the steering wheel of the yacht and in charge of its navigation. When the Escape was in the vicinity of 60th Street, just to the north of the Queensboro Bridge, Landi reduced the engine speed on both engines from 2,000 revolutions per minute to 1,500 revolutions per minute. At the reduced speed the Escape was proceeding at about 2½ knots over the bottom.

10. When the Escape was in the vicinity of 55th Street proceeding at a speed of about 2½ knots over the bottom about in the center of the river, a yacht called the An-Ge overtook and passed the Escape on the Escape's starboard side. Alfred Landi turned the Escape to starboard in order to take the wake of the An-Ge on the Escape's bow. Shortly thereafter, Landi turned the Escape to port so as to straighten out and proceed down river. There was no change in speed during this operation.

11. The Derby was also proceeding down river further to the north of the Escape but proceeding faster than the Escape. The distance between the Derby and the Escape at the time of the slight

alteration in the course of the Escape was about 150 yards.

12. The Derby proceeded downstream almost directly astern of the Escape, rapidly overtaking that vessel. Shortly after 4.00 P.M., with the Escape proceeding at a speed of about 2½ knots over the bottom on a course almost parallel to the banks of the river and with the bow of the Escape pointed slightly to the port, Ruth Yurgrau noticed a ship a few feet astern. Immediately thereafter the starboard bow of the Derby struck the transom of the Escape at its port stern corner, causing the Escape to list heavily to starboard. The starboard bow of the Derby rubbed along the port side of the Escape. The Escape was carried to the south on the starboard bow of the Derby for a considerable distance.

13. The collision occurred about off 50th Street. The Escape had not altered course from the time she turned to go downriver after taking the waves of the An-Ge on her bow until the collision. The speed of the Escape had not been changed from the time she reduced speed at 60th Street until the engines were placed full ahead seconds prior to the collision.

14. At no time prior to the collision did the Derby sound any whistle signals. No one was stationed on the tanker's bow. At no time prior to the collision, as the Derby was overtaking the Escape, did the Derby change her speed or alter her course.

15. The navigator of the Derby had not seen the Escape prior to the collision and was not aware that a collision had occurred until some minutes after the event had occurred.

#### Discussion

The conduct of the two vessels involved in this collision as they proceeded down the East River was governed by the Inland Rules of the Road, Act of June 7, 1897, 30 Stat. 96, 33 U.S.C.A. § 154 et seq.

■ The yacht Escape was a "steam vessel" within the definition of the Act, which stated that the words "steam vessel" shall include any vessel propelled by machinery.

The Inland Rules of the Road applicable to this overtaking situation are as follows:

Article 18, Rule VIII, 33 U.S.C.A. § 203:

"Rule V.III. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals.

"The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel."

Article 24, 33 U.S.C.A. § 209:

"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position with reference to the vessel which she is

overtaking that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

"As by day the overtaking vessel cannot always know with certainty whether she is forward of or abaft this direction from the other vessel she should, if in doubt, assume that she is an overtaking vessel and keep out of the way."

Article 21, 33 U.S.C.A. § 206:

"Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."

Article 29, 33 U.S.C.A. § 221:

"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

■ The proof in this case indicates that the Derby violated both Article 18 and Article 24 of these Inland Rules. None of the witnesses reported hearing any signal by the tanker prior to the collision and it is obvious that the Derby did not keep out of the way of the overtaken vessel.

■ While the presence of a lookout is not essential on all occasions, under the circumstances of this case, with the Derby trimmed as she was and with the normal heavy traffic on the East River, the failure to maintain a lookout on the bow was negligent. See Article 29, Inland Rules of the Road, 33 U.S.C.A. § 221; The Ariadne, 1871, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542; The Madison, 2 Cir., 1918, 250 F. 850.

These gross violations by the Derby establish her culpability for the collision conclusively. Speaking only of the signal requirement, one author has commented: "There is thus effective a requirement so rigid with respect to the overtaking vessel in inland waters that unless she signals and receives permission to pass, the only question usually left to the courts to decide after a resulting collision is whether she shall pay all the damages or only half of them." Farwell, The Rules of the Nautical Road, 271, 272.

■ The possible negligent operation of the yacht Escape is the only point at issue here. Correlative to the duty of the overtaking vessel to keep out of the way of the overtaken vessel is the duty of the overtaken vessel to keep her course and speed. (Article 21.) The weight of the testimony indicates that the Escape maintained her speed from about 60th Street until a few seconds before the collision when Landi threw the throttles of the Escape full forward in an attempt to avoid the collision. The witnesses for the petitioners-libellants all testified to the constant, although very slow, progress of the Escape. It is true that one witness, Hallheimer, testified that the pleasure cruiser was stationary in midstream and that her propeller was not moving. However, in the light of the testimony of all the other witnesses, including those for the claimant, it appears that this impression was not accurate and that the Escape was at all times proceeding very slowly downstream.

There was one alteration in course by the Escape. When the An-Ge passed the Escape at about 55th Street, Landi turned the cruiser slightly to starboard in order to catch the wake of the An-Ge on his bow. The alteration appears to have been slight. It was so testified to by Landi. Mrs. Yurgrau, a passenger aboard the Escape, saw no definite change in course but noticed only a slight change in navigation in order to "go into a wave." Waltl, who observed the

Escape from the time she passed the 59th Street Bridge and saw the An-Ge pass the Escape, did not notice any alteration in course by the latter vessel. Rockwood also saw the An-Ge pass the Escape and saw the slight alteration in course by the Escape. As soon as the swells from the An-Ge passed, Rockwood testified that the Escape straightened out again and proceeded down the river.

In addition to the fact that the deviation was slight, it appears that, in the words of Rockwood, there was "considerable room" between the Derby and the Escape at the time of the change in course. Rockwood estimated the distance at from one hundred to one hundred and fifty yards. Hawkinson, who was on the An-Ge, testified that the An-Ge passed the Derby around 70th Street and the Escape in the vicinity of the 50's or 60's. Waltl saw the An-Ge pass the Escape but "there was no tanker in sight when that passed by." (SM 54.) Landi stated that five minutes passed between the time the An-Ge passed the Escape and the collision. The point at which the An-Ge passed the Escape appears to be about 55th Street. The collision occurred at about 50th Street. With the witnesses agreed as to the slow progress of the Escape, a speed of about 2½ knots over the bottom, there was sufficient room between the overtaking vessel and the Escape at the time of the alteration of the Escape's course for the Derby to avoid the collision.

This slight alteration in course did not change to an appreciable extent the relative position of the vessels in the river. It is possible that before this slight change in course the Escape was a little closer to midstream than the Derby. Hawkinson testified that the An-Ge passed the Derby on the starboard side of the An-Ge and passed the Escape on the port side of the An-Ge. While all other witnesses to the passing of the Escape by the An-Ge, including Landi, agree that the An-Ge passed the Escape on the starboard side of the Escape, there was no other testimony concerning the passing of the Derby by the An-Ge. In the ab-

sence of any testimony as to the course of the An-Ge, the testimony of Hawkinson concerning the passing of the two vessels does not compel the conclusion that the Escape was considerably closer to midstream than the Derby.

Waltl testified that the vessels were midstream and the tanker directly astern of the Escape. Rockwood, who first saw the Derby when she was not quite as far as 55th Street, said that both vessels were approximately in the middle of the river and the "Derby came down right on top of her." (SM 59.) Hallheimer said that both vessels were in midstream and "the tanker appeared to be in the direct line of the cabin cruiser." (SM 81.)

The weight of the evidence indicates that the initial point of impact was on the port side of the transom of the Escape. It was on the extreme port side of the transom in the area where the side planks meet the transom. A physical survey of the vessel indicated that the planking of the transom was moved to the right approximately one quarter of an inch. The marine surveyor, Ryder, testified that the port quarter showed all the evidence of the blow with rub marks all along the port side. This physical survey is consistent with the description of the actual collision given by Landi and Waltl. The testimony of Mrs. Yurgrau that there were two impacts is not inconsistent with this conclusion. The second impact felt by her could be accounted for by the rubbing of the Escape along the starboard bow of the Derby.

The weight of the testimony also indicates that the Escape was carried or dragged along for some distance on the starboard bow of the Derby. This occurrence is also consistent with the account of the collision given by Waltl and Rockwood. Instead of being pointed directly downstream, it appears that the bow of the Escape was pointed slightly to port. Hallheimer stated that the Escape "was proceeding practically parallel to the [East River] Drive with a slight deviation of the bow to the port." (SM 85.) Fairchild's testimony at the Coast

Guard hearing also included the statement that when the Derby got very, very close to the Escape, the bow of the cruiser veered slightly towards the tanker. The slight inclination of the bow of the Escape to port also explains to a certain extent the testimony of Capt. Anderson of the Tydol and Douglas Fearn, the seaman on that vessel. Fearn's testimony can be discounted to a great degree. He didn't see the actual collision and testified that he was not observing the vessels too closely.

The testimony of Capt. Anderson that he saw the Escape sheer over sharply in front of the Derby cannot be explained, however. In addition, the testimony of the captain that the Escape was hit amidships is inconsistent with the testimony of the witnesses on shore, of Landi and Mrs. Yurgrau, occupants of the Escape, and Ryder, the marine surveyor. It appears that the starboard bow of the Derby first hit the Escape and the Escape was carried downstream on the starboard bow of the Derby. If the Escape were hit amidships, it is difficult to see how she could have come around to nestle on the starboard bow of the Derby and how the major damage could have been sustained as described by the marine surveyor. (See Petitioners' Exhibits 3, 4 and 5.)

■ The testimony of Landi and Mrs. Yurgrau as to the progress and maneuvers of the Escape is entitled to greater weight than that given to the witnesses elsewhere. Griffin on Collision, § 270; The Alexander Folsom, 6 Cir., 1892, 52 F. 403, 411.

■ As outside witnesses, not connected with either vessel, the testimony of Waltl, Rockwood, Hallheimer and Fairchild is entitled to substantial weight. They were well placed for observation and they told a credible story. They were seated or walking along the shore and witnessed the collision as spectators might watch a sporting event. The testimony of those witnesses was mainly uniform with only minor dissimilarities.

The angle of observation, the comparatively limited period of observation and the physical facts of the point of impact as testified to by the marine surveyor all tend to discredit the testimony of Capt. Anderson. See The Coamo, 2 Cir., 1922, 280 F. 282.

■■ Of course, as far as the Derby is concerned, the unexplained failure to call as a witness anyone connected with the navigation of that vessel may give rise to an unfavorable inference concerning that navigation. See Clifton v. United States, 1846, 4 How. 242, 45 U.S. 242, 11 L.Ed. 957. Omission to produce a lookout or to account satisfactorily for not doing so gives rise to an inference that a proper lookout was not kept. See The New York, 1899, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126. This inference is supported by the testimony of all of the witnesses to the collision who saw no one on the bow of the Derby prior to the collision. The very conduct of the vessel indicates that there was no lookout.

A reconstruction of the collision as determined by the credible evidence is as follows:

On May 20, 1956, the Escape cruised slowly down the East River close to midstream at a speed of 2½ knots over the bottom. When the An-Ge passed her on the starboard side of the Escape at about 55th Street, Landi, the operator of the Escape, turned momentarily to starboard in order to catch the waves on his bow. Immediately thereafter, he turned the vessel to port, straightened out again, and then continued downstream almost parallel to the shore, with the bow pointed slightly to port.

The Derby was also proceeding downriver, close to midstream, astern of the Escape. Although the Derby may have been slightly closer to the New York shore than the Escape before the slight alteration to starboard by the Escape, this alteration did not materially affect the respective positions of the vessels. At all times the Derby was directly astern of the Escape. Proceeding at a speed of about 9 knots, the Derby, with

no lookout posted, overtook the Escape at about 50th Street and ran the smaller vessel down. The starboard bow of the Derby first hit the port transom of the Escape at the quarter. The starboard bow of the Derby then caught the port side of the Escape carrying the smaller vessel downstream for a considerable distance. The Derby did not signal the Escape at any time prior to the collision and had no lookout on her bow.

■ With those findings as to the relative conduct of the vessels, it follows that the Escape did not violate Article 21 of the Inland Rules of the Road, which required her to keep her course and speed in an overtaking situation. During the pertinent period of overtaking, the Escape kept her course and speed.

■ Even if the contention of the claimant that the Escape veered in front of the Derby is accepted, under the law in this circuit the duty of the Escape to maintain her course and speed did not exist until the overtaking vessel signaled her presence. Judge Learned Hand in The Industry, 2 Cir., 1928, 29 F.2d 29, at pages 29–30 stated as follows:

"The fault of the Industry is so plain and so gross that the only question can be as to whether the Viking, the vessel ahead, was not also at fault for her change of course. Article 24 (33 U.S.C.A. § 209) puts the burden upon the overtaking vessel to keep out of the way till she is 'past and clear,' and article 21 (33 U.S.C.A. § 206) in general provides that, whenever one vessel must keep out of the way, the other shall keep her course and speed. Therefore, taken without recourse to the other rules, it might be inferred that, whenever one vessel is in fact overtaking another, the vessel ahead must hold her course and speed. However, rule 8 of article 18 (33 U.S.C.A. § 203) further modifies the relative duties when each vessel is a steamer. If she would pass, an overtaking steamer must signal, and before passing must get the con-

sent of the steamer ahead. The rule concludes by saying that the steamer ahead shall in no case attempt to cross the bows of the overtaking steamer or to crowd upon her course. It is perhaps possible to read this language as referring to the period before the exchange of signals, as well as thereafter, but it seems to us unreasonable to do so. In the first place, so construed, it would add nothing to the general duty prescribed by article 21. Rather we think it intended to make clear that it is only after the exchange of signals that the duty of the vessel ahead begins at all."

See also The Syosset, 2 Cir., 1934, 71 F. 2d 666; The S & H No. 2, Inc., 2 Cir., 1941, 119 F.2d 666. It was held in The Industry, supra, that while it remains possible for the overtaking vessel to accommodate herself to a change in course or speed of the vessel ahead, the leading vessel is not held to any duty but may execute her purpose regardless of the overtaking vessel.

Under the facts in this case, that rule is applicable. The slight alteration in course by the Escape towards the Manhattan shore was at a time when it was possible for the Derby to accommodate herself.

■ Even if it were to be held that this maneuver or a later maneuver came at a time when it was impossible for the Derby to avoid the collision, the Derby would still be held to be solely at fault. In The M. J. Rudolph, 2 Cir., 1923, 292 F. 740, at page 742, the court held: "If the overtaking vessel comes so close to an overtaken vessel that a sudden change of course by the latter may bring about a collision the fault is that of the overtaking vessel. She should not come so close without a signal." See also The Holly Park, 2 Cir., 1930, 39 F.2d 572.

The remaining possible fault of the Escape was the failure to keep a lookout astern. Landi did not utilize anyone aboard the Escape to act as lookout for him and did not glance astern as he pro-

ceeded downriver. Article 29 of the Inland Rules states that nothing in the rules shall exonerate any vessel from the consequences of any neglect to keep a proper lookout. However, as pointed out in The Blue Jacket, 1892, 144 U.S. 371, 390, 12 S.Ct. 711, 718, 36 L.Ed. 469: "* * * the provision * * * is that a vessel is not to be exonerated from the consequences of any neglect to keep a proper lookout. It does not say that a vessel shall, because of not keeping a proper lookout, be visited with the consequences of a collision. If the collision does not result as a consequence of neglecting to keep a proper lookout, the vessel is not thereby made responsible for the consequences of the collision."

■ In general, an overtaken vessel is under no duty to keep a lookout aft to prevent being run down by the overtaking vessel, but has a right to act on the presumption that the latter will keep clear. The Greystoke Castle, D.C.N.D. Cal.1912, 199 F. 521; The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771; The Holly Park, 2 Cir., 1930, 39 F.2d 572.

■ Even if the absence of a lookout were to be deemed a fault, under the circumstances of this case, such fault was only a condition of the collision and not a cause. As Judge Learned Hand stated in The Perseverance, 2 Cir., 1933, 63 F. 2d 788 at page 790: "As to the ship, we are disposed to exonerate her, though she was at fault as we have said. We accept the common form of statement that the fault must be a 'cause,' not a 'condition,' of the collision."

■ It is, of course, true that the petitioner has the burden of proving entitlement to exoneration or limitation. The Edward E. Loomis, 2 Cir., 1936, 86 F.2d 705. The fact that one of the owners, Landi, was the operator of the Escape would prevent any exoneration or limitation of liability if the Escape was negligently operated. See In re Follett's Petition, D.C.S.D.Tex.1958, 172 F.Supp. 304. However, as the Court of Appeals for the Second Circuit has noted:

"The allegation in the petition that the petitioner was himself handling the hawser aboard the tug at the time of the accident is not incompatible with limitation of liability. 'Privity and knowledge' is a term of art meaning complicity in the fault that caused the accident, and if the petitioner is free from fault his actual knowledge of the facts of the accident does not prevent limitation. The 84–H, 2 Cir., 296 F. 427, certiorari denied 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 867; 3 Benedict on Admiralty § 489 (6th Ed. 1940). Of course petitioner must establish such facts at trial." Blackler v. F. Jacobus Transportation Co., 2 Cir., 1957, 243 F.2d 733, 735.

■ The fault of the Derby is so grave and so fully accounts for the collision that this court should not be astute to find fault with the navigation of the Escape. Where the fault of one vessel is gross, any doubts regarding the management of the other vessel or the contribution of her faults to the collision should be resolved in her favor. The M. J. Rudolph, 2 Cir., 1923, 292 F. 740, 743; The Socony No. 19, 2 Cir., 1928, 29 F.2d 20; The Great Republic, 1874, 23 Wall. 20, 90 U.S. 20, 23 L.Ed. 55. The negligent conduct of the Derby clearly accounts for the collision and she should be held solely liable for the resulting loss.

In the petition of Mildred Mainieri and Alfred Landi for a decree for exoneration from or limitation of liability (A. 189–156), let a final decree be entered exonerating them from any liability arising as a result of this collision and dismissing all claims filed against them.

In the libel by Mildred Mainieri, Alfred Landi and Fireman's Insurance Company of Newark, New Jersey, an interlocutory decree is to be entered for the full amount of the damages to the yacht Escape and her equipment resulting from this collision in favor of the libellants and against Diesel Tanker M. J. Derby, Inc. as claimant. The matter

is to be referred to a Commissioner to take proof of such damages and report thereon with all convenient speed. Allowance of interest and costs is to be determined upon entrance of a final decree.

## Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter of these actions.

2. The tanker M. J. Derby II was at fault for failing to give some signal to the Escape II so that the Escape II might become aware that the tanker was astern of her.

3. The tanker Derby violated Article 18, Rule VIII of the Inland Rules of the Road (33 U.S.C.A. § 203) in that as the overtaking vessel she failed to indicate her intention to pass the Escape by sounding an appropriate whistle signal.

4. The tanker Derby violated Article 24 of the Inland Rules of the Road (33 U.S.C.A. § 209) in that as the burdened vessel she failed to keep out of the way of the Escape.

5. The Derby was at fault for failing to maintain a proper lookout.

6. The faults of the Derby so fully account for the collision that any doubt with regard to the conduct of the Escape is resolved in her favor.

7. Neither the Escape nor its navigator committed any faults which operated to cause the collision.

8. The petitioners are not at fault for the collision and the resulting damage and are entitled to a final decree exonerating them from any liability arising as a result of this collision and dismissing all claims filed against them.

9. The libellants are entitled to an interlocutory decree in their favor providing for a recovery from Diesel Tanker M. J. Derby, Inc. as claimant for the damages sustained by the yacht Escape and her equipment resulting from this collision.

Settle decrees on notice before June 29, 1960.