AMERICAN STEAMSHIP COMPANY, a corporation, as Owner of THE Steamer DOW CHEMICAL, Libelant and Cross-respondent,

and

The Steamer Dow Chemical, her engines, boilers, etc., Cross-respondent,

v.

THE Carferry Steamer GRAND RAPIDS, her engines, boilers, etc., Respondent,

and

Grand Trunk-Milwaukee Car Ferry Company, Respondent, Claimant of the Carferry Steamer Grand Rapids, and Cross-libelant.

No. 19849.

United States District Court
E. D. Michigan, S. D.
July 21, 1961.

Coffey, Heffernan & Harrison, Buffalo, N. Y. Hill, Lewis, Andrews, Adams, Goodrich & Power, Detroit, Mich., for libelant and cross respondent.

Foster, Meadows & Ballard, Detroit, Mich., for respondent.

FEIKENS, District Judge.

1. On July 25, 1959, libelant and cross respondent, American Steamship Company, a New York corporation, was and is now the owner of the steamer Dow Chemical, a self-unloading bulk carrier of 6612 gross tons with a keel length of 504 feet and overall length of 525 feet, a beam of 56 feet and a molded depth of 30 feet.

2. On July 25, 1959, respondent and cross libelant, Grand Trunk-Milwaukee Car Ferry Company, a corporation, was and is now the owner of the steamer Grand Rapids, a vessel of 2,942 gross tons with a keel length of 348 feet and overall length of 360 feet, a beam of 56 feet and a molded depth of 21′6″.

3. The steamer Grand Rapids traded regularly between Muskegon, Michigan, and Milwaukee, Wisconsin, and for this purpose used its carferry slip in Muskegon Harbor in Muskegon Lake.

4. On July 25, 1959, the steamer Dow Chemical arrived at Sand Products Corporation dock in Muskegon Harbor, Muskegon Lake, without cargo and commenced to load sand at 6:15 a. m., EST; that this cargo was to be taken to Cleveland, Ohio; that the dock at which she was loading was located on the westerly shore of Muskegon Lake and during loading the vessel lay with her starboard side to the dock.

5. At approximately 4:35 p. m., EST, some five minutes before the Dow Chemical left her dock, her master, Capt. Oscar H. Gronwall, made a security call over the open channel of the ship's radiotelephone advising all ships in the vicinity that she was leaving and that she was due at the outer breakwall (the Lake Michigan end of the entrance channel) in one half hour. There was no response to the security call.

6. Loading was completed at 4:20 p. m., EST, and the vessel departed her dock at about 4:40 p. m., EST. Her departure was accomplished by letting go her stern mooring lines, working engines full ahead on right rudder and holding her bow against the dock with the forward mooring lines so that her stern swung to the left and out into Muskegon Lake. When she reached a heading of 220 degrees true, her bow lines were let go, her engines were worked astern and she backed out into the lake on this course for approximately three minutes until her stern reached a point about 1900 feet out from the dock. Her engines were then put full ahead with hard

right rudder until she reached a heading of 288 degrees true on a target located on the eastern corner of the north wall of the entrance channel leading from Muskegon Lake to Lake Michigan. She continued on this course with her engines working full ahead.

7. The carferry Grand Rapids arrived at Muskegon from Milwaukee at about 2:45 p. m., EST, on July 25. Her Master, Capt. Clyde Warner, knew at that time that the Dow Chemical was loading at the Sand Products dock. The Grand Rapids lay at her dock, her bow heading out toward Muskegon Lake, and she departed her dock under full speed ahead engines at 4:43 p. m., EST, fully loaded with railroad cars and with some passengers aboard bound for Milwaukee, Wisconsin. She was powered by twin screw steam engines.

She proceeded straight out from her slip until her stern ahead cleared the dock by approximately 500 feet so that her bow was about 860 feet out from the dock when she turned to port and on a heading of 298 degrees she was steered on a high point of land or a high hill. On this heading the Grand Rapids attained a speed of approximately 13 miles per hour.

8. The Master of each vessel observed the other prior to leaving his respective dock "after departure" and at intervals up to the time of collision. Each knew that the other's vessel was bound for the entrance channel. The weather was clear, the visibility was good, and there were no other vessels in the vicinity which were a factor in the subsequent collision between the two vessels.

9. The Master of the Dow Chemical continued to observe the Grand Rapids coming up fast off the starboard quarter of the Dow Chemical and when the Dow Chemical reached a point about 500 feet from the center line of the channel, extended into Muskegon Lake, and while still on her course, the Dow Chemical's Master sounded a danger signal of five or more short blasts on her whistle. When the Dow Chemical reached a point about 250 to 300 feet from the center line

of the channel extended, her course was altered when her Master ordered hard left rudder to line up and pass out through the channel.

10. Meanwhile, when the Grand Rapids reached a point approximately abreast of the entrance of the channel where it intersected with her course of 298 degrees, her Master ordered her rudder put hard to port and she lined up with the channel entrance on a heading of 248 degrees. Immediately after turning onto this course of 248 degrees, her Master ordered her engines reversed but she continued on and her stem collided with the starboard afterquarter of the Dow Chemical in the vicinity of the channel entrance and at approximately 4:55 p. m., EST. The impact occurred at a point approximately 475 feet aft of the stem of the Dow Chemical and both vessels sustained substantial damage in the collision.

11. From the time the Grand Rapids hauled onto the 298 degree course, she ran a distance of 1⅜ miles under full speed ahead engines with a draft of 12′ 6″ forward and 15′ 6″ aft.

12. By admission of her Master, Capt. Clyde Warner, the Grand Rapids was at all times more than 2 points abaft the beam of the Dow Chemical until the Grand Rapids reached a point 500 feet from the point where she hauled to the 248 degree course.

13. The danger signal blown by the Dow Chemical was the only whistle signal blown by either vessel.

14. The Grand Rapids was equipped with a radio-telephone but her Master did not attempt to communicate with the Dow Chemical at any time.

15. The Grand Rapids had a lookout on her forecastle deck but he made no report of any kind to the Master and the anchors of the Grand Rapids were locked and were not ready for use and no order to let go the anchors was given.

16. The Grand Rapids could be stopped from full speed ahead by working engines full astern in about 3 of her lengths or 1000 feet.

17. The Master of the Grand Rapids made up his mind not to attempt to pass out of the channel ahead of the Dow Chemical when the Grand Rapids was about 1000 feet before the point where she hauled from the 298 degree course to the 248 degree course but notwithstanding, she kept on at full speed and made the haul for the entrance channel.

■ 18. The Dow Chemical was the overtaken vessel and the Grand Rapids was the overtaking vessel and under the requirements of the Great Lakes Rules of the Road (33 U.S.C.A. § 287) and regulation 90.8 thereunder, the Grand Rapids was the burdened vessel and was obligated to "keep out of the way" of the Dow Chemical.

19. The Grand Rapids was at all material times more than 2 points abaft the beam of the Dow Chemical and specifically was more than 2 points abaft the beam of the Dow Chemical when her Master while on a 298 degree course notwithstanding his determination not to pass out of the channel ahead of the Dow Chemical, nevertheless hauled left onto a 248 degree course attempting thereby to escape from the demands of Rule 22 and Regulation 90.8.

■ 20. The Grand Rapids as the burdened vessel under the overtaking rule was in violation of the rules by altering her bearing and thereby placing herself on collision course.

■ 21. The starboard handrule (Rule 18, Great Lakes Rules of the Road, 33 U.S.C.A. § 283) does not apply in this case.

22. The Grand Rapids was guilty, at the least, of negligence in the following aspects:

A. Failure to comply with the provisions of Rule 22—to keep out of the way of the overtaken vessel, the Dow Chemical.

B. Failure to comply with the provisions of Regulation 90.2—the giving of a danger signal and the failure to stop effectively and in safety when her Master became apprehensive of collision.

C. Failure to comply with the provisions of Regulation 90.8—to signal and to hold back since she was the overtaking vessel.

■ 23. The Dow Chemical, as the preferred vessel, was without fault and was entitled to maintain her speed and to steer the course necessary to take her out of the channel.

## Conclusions of Law

1. This Court has jurisdiction of the subject matter of this action and of the parties hereto.

2. Libelant and cross-respondent was free from fault which contributed to the collision.

3. The collision was caused by the negligence of the carferry Grand Rapids and hence the Grand Trunk-Milwaukee Car Ferry Company, respondent and cross-libelant.

4. Respondent and cross-libelant Grand Trunk-Milwaukee Car Ferry Company is liable for the damages sustained by the steamer Dow Chemical.

## Discussion

Recitation of numerous cases is not necessary to decision.

The rules of navigation for the Great Lakes are applicable here. See 33 U.S. C.A. §§ 241–295 incl., and The Venetian, D.C., 29 F. 460.

■ Respondent's principal argument revolves about the contention that since the Grand Rapids was on a divergent course from that of the Dow Chemical, the Grand Rapids was not an overtaking vessel and the applicable rule did not apply. This contention cannot be accepted. In this situation it is conceded that both vessels were headed for a narrow entrance channel and within minutes would be on the same course. A vessel may not escape from the requirements of the rule through the technique of using a divergent course.

In Northern Navigation Co. v. Minnesota Atlantic Transit Co., (remarkably

similar to this case) 8 Cir., 49 F.2d 203, at pages 206, 207, it was stated:

"From the positions they held at the start, however, with the King in advance and both vessels having the same distance and traveling at about the same speed and arriving within the pierheads at about the same time, the conclusion is inevitable that the Noronic was at all times more than two points abaft the beam of the King except as she was passing the King. The appellant contends, however, that, even if the King was at one time the overtaken vessel, the situation and position of the two vessels changed before their arrival at the piers, and at that time they were approaching each other at right angles or obliquely so as to involve risk of collision, and that the vessels then came within the rule known as the 'Starboard Hand Rule,' which permits the vessel on the starboard to have the right of way. That rule has to do with a situation distinctly stated in the rule 'other than when one steamer is overtaking another.' The statement by the trial court that the two vessels were approaching the canal piers on converging lines, or from slightly varying directions, is far from a holding that they were approaching each other obliquely so as to involve risk of collision and that their positions were other than one where one steamer was overtaking another."

In Commonwealth and Dominion Line v. United States, 2 Cir., 20 F.2d 729, at page 731, Judge Learned Hand said:

"A ship is on a steady course, not only when her heading does not change, but whenever her future positions are certainly ascertainable from her present position and movements."

For the obligation to sound a signal under the rule see Petition of Landi (Landi et al. v. Steamship M. J. Derby, II), D.C.S.D.N.Y., 194 F.Supp. 353, 1961 A.M.C. 690.

For look-out requirements see The Ariadne, 13 Wall 475, 478, 80 U.S. 475, 478, 20 L.Ed. 542.

An order consonant with these findings of fact and conclusions of law may be entered.